## CITY OF ST. LOUIS v. MISSISSIPPI RIVER FUEL CORPORATION.

### No. 2566.

District Court, E. D. Missouri, E. D.

Oct. 27, 1944.

Joseph F. Holland and Oliver Senti, both of St. Louis, Mo., and H. H. Hamilton, of New York City, for plaintiff.

Sullivan, Finley & Lucas, Wilder Lucas, and William G. Marbury, all of St. Louis, Mo., for defendant.

HULEN, District Judge.

### Facts.

Plaintiff's petition seeks to recover from the defendant a five per cent gross receipts tax on defendant's sales of gas in the city of St. Louis for the period commencing July 1, 1938, and ending June 30, 1943, inclusive, by virtue of its Ordinance No. 41325. The petition is in ten counts, each count covering a six months' period, and (after giving the defendant credit for the amount which it paid as a merchant's tax) seeks a judgment of $217,953.06.

The defendant, a Delaware corporation, during the period involved in this case was engaged in the business of purchasing natural gas from producers in gas fields located in the State of Louisiana, and transporting and selling the gas, through pipe lines owned by it, running from near the gas fields into and through the States of Arkansas, Illinois and Missouri. Defendant's pipe lines and all branches to customers are laid upon right-of-ways privately acquired from land-owners. The defendant does not own any tanks or holders for the storage of gas. The gas, on being received into defendant's line, moves northward, under pressure, and is distributed to certain utilities and industries located in Arkansas, Illinois and Missouri. No gas is sold to casual or temporary customers. Sales are on the basis of written contracts made in advance with each particular customer. Defendant's customers located in St. Louis executed their contracts in St. Louis after they had been negotiated by representatives of the St. Louis office. The billing and collecting for the gas is performed in the city of St. Louis. The contracts provide that the place of delivery of the gas shall be the outlet of the meter, set by the defendant to measure the gas delivered to the particular customer. At Meramec Junction in Missouri, defendant's transmission line is divided, one division crossing the Mississippi River into Illinois, and extending through the industrial district on that side of the river, and terminating in the city of Alton, and the other division running into the city of St. Louis. The defendant has field employees who visit the customers' plants in the city of St. Louis and elsewhere to observe what appliances are in use, and extent of gas requirements. A dispatcher's office is maintained at Meramec Junction, with telegraphic and telephonic connection with its various compressor stations along the lines, including the original one receiving the gas in the Louisiana field.

The delivery of gas to defendant's customers is through a lateral line. This lateral line is constructed from the transmission line or division line to the point of delivery on the premises of the customer. There is a meter installed to measure the gas as it passes from defendant's line into that of the customer. These meters record the volume of gas passing through the meters, and these charts are installed daily by the defendant, whether the meter is owned by the defendant or the customer. Flow of gas to the customer is regulated automatically. Gas in the defendant's main transmission line is in constant motion, and likewise in the lateral lines, except when the customer is not taking gas. The gas moves through the defendant's transmission lines in bulk, there being no segregation for a particular customer until delivery through the meter at the customer's receiving line.

Defendant was engaged during the period covered by the petition in the sale of gas for industrial purposes and in sales to public utilities for resale. With rare exception, defendant's product was used in the manufacture of products for resale. Some gas was used for heating purposes in the manufacturing plants of defendant's customers. Total sales of defendant to its customers from the last half of 1938 to the first half of 1943 were $4,525,192.94, and it was estimated gas used for space heating during the same period amounted to $92,545.79.

The defendant is not a public utility, but sells gas only under special contract with certain utilities and selected industries. It sells no gas for domestic use. It has never claimed the power of eminent domain, nor has it ever sought any franchise from any authority to distribute natural gas or any other product, as a public utility. Defendant holds a Certificate of Convenience and

Necessity from the Federal Power Commission under Section 7 of the Natural Gas Act, 15 U.S.C.A. § 717f, authorizing it to carry on its operations in interstate commerce under the terms of the Natural Gas Act, and defendant is required to file its contracts with the Federal Power Commission. Defendant files no schedules of rates with the Public Service Commission in Missouri, but holds a license from the Secretary of State of Missouri to engage in business in the State of Missouri of transportation, sale and delivery in interstate commerce of natural gas purchased and sold by it, under private contract, and not as a public utility.

This case was submitted on an agreed statement of facts, with the exception of three witnesses offered by the defendant on the meaning in the gas industry of certain language used in the ordinance in question.

Beginning in 1930 and continuing to and including the year 1943, the License Collector of the City of St. Louis annually served a notice on the defendant which contained copy of ordinances and forms for making a return as a merchant, under the Merchant License Ordinance of the city of St. Louis. Beginning with the year 1939 the notice read as follows:

"You are hereby notified that every merchant is required by law to furnish the License Collector: First, a statement of the value of the largest amount of all goods, wares and merchandise which he had in his possession or under his control, whether owned by him or consigned to him for sale by other parties, at any one time between the first Monday of March and the first Monday of June, 1939. Second, a statement of the aggregate amount of all sales made by him (except interstate sales) during the year next preceding the first Monday of June, 1939."

The language in the notice "except interstate sales" was inserted for the first time beginning with the year 1939, and the defendant was unaware of this insertion until July 18, 1944.

In compliance with the demands in the notices, the defendant annually from 1930 to 1943 inclusive returned a statement of its sales of gas in St. Louis for the period specified and the Collector of plaintiff annually demanded the payment of the merchant's tax of $1.25 per thousand on sales, which payments were made by the defendant on receipt of demand therefor from the plaintiff. These payments were made under Sections 1395 to 1400, inclusive, of the Revised Code of the City of St. Louis. A notice and demand was served on the defendant in 1943 and defendant tendered its check in payment for the year 1943, but on August 14, 1943, the City returned defendant's check and notified the defendant, for the first time, that it should make returns and pay the taxes on sales "required by Ordinance No. 41325." Defendant refused to make the payments demanded under Ordinance No. 41325. This suit is to force compliance by defendant.

Prior to the passage of Ordinance No. 41325 there had existed for a number of years a controversy between the Laclede Gas Light Company (a public utility operating in the city of St. Louis) and the plaintiff, involving rates to be charged to consumers in the city of St. Louis, and the validity of an ordinance of the city, by virtue of which the city was making certain demands on the utility. On February 11, 1938 plaintiff and the Laclede Gas Light Company signed an agreement settling their mutual claims and certain litigation then pending. This agreement, among other things, provided:

"7. The City, with the approval and consent of the Company, agrees to recommend to the Board of Aldermen the enactment of a 5% Gross Receipts Tax upon the sale of artificial, mixed or natural gas, which proposed ordinance shall be in a form agreeable to both the Company and the City. The Company agrees that after the effective date of said proposed ordinance the Company will pay the aforesaid tax as same accrues."

Prior to the execution of the agreement between the City and the Laclede Gas Light Company, the Mayor of the City of St. Louis made a formal announcement of the details of the agreement as of December 20, 1937. The terms of the proposed agreement, as contained in the Mayor's announcement, are as follows:

"2. The Company agrees to the payment to the City of a tax of 5% upon its gross receipts. The payment of such a tax is being contested by The Laclede Gas Light Company in a case set for trial this morning in the United States District Court. An ordinance levying a tax of 5% upon the Company's gross receipts in a form which the Company has agreed to accept will be introduced in the Board of Aldermen immediately. Such a tax will produce

approximately $350,000.00 additional revenue for the City annually."

In accord, if not compliance, with the agreement between the City of St. Louis and the Laclede Gas Light Company, Ordinance No. 41325 was passed and became effective May 17, 1938. That part of Ordinance No. 41325 involved in this proceeding reads as follows:

"Section One.—Every person, firm or corporation now or hereafter engaged in the business of selling or distributing natural, artificial, or mixed natural and artificial, gas *for heating, lighting, power and refrigeration* in the City of St. Louis shall pay to the City of St. Louis, as a license tax, a sum equal to five 'per cent (5%) of the gross receipts from such business." (Emphasis added.)

Section Three of the Ordinance provides that the tax called for in Section One shall be in lieu of any other excise license or occupation tax.*

Since the hearing of testimony in this case, the plaintiff, with commendable candor, has submitted findings of fact, conclusions of law and form of judgment, the import of which is that plaintiff concedes that the Court should find against it on Counts One to Nine of the petition on the defendant's plea of estoppel. To the Tenth Count for tax under Ordinance No. 41325, based on business done by the defendant during the six months' period ending June 30, 1943, defendant urges five of the defenses set up in the answer. In order of presentation by defendant they are:

I. That plaintiff is estopped from asserting any claim because (a) failure of plaintiff to tender back to defendant the merchant's license tax paid by the defendant, and (b) that because of plaintiff's demand and collection of the merchant's license tax the defendant acted upon such demands to its injury and damage.

II. That the "business" of the defendant does not come within the scope of the ordinance.

III. That plaintiff has no charter power to levy the proposed tax.

IV. That the ordinance is a special law and therefore in violation of the Constitution of Missouri; that it also violates the due process and equal protection clauses of the Federal Constitution.

V. That the defendant is engaged in interstate commerce and Ordinance No. 41325 constitutes an attempt to tax and regulate interstate transactions against the mandate of the Federal Constitution.

■ I. Plaintiff, by tender of suggested findings of fact, conclusions of law and form of judgment, concedes the correctness of defendant's plea of estoppel as to the first nine counts of the cause of action

---

* "Section Two.—It is hereby made the duty of every person, firm or corporation engaged in the business described in Section One hereof to file with the Comptroller of the City of St. Louis, on the 15th day of July, 1938, a sworn statement of gross receipts of such person, firm or corporation for such business from the effective date of this ordinance to July 1, 1938, and to file thereafter on the 15th day of January and July of each year a sworn statement of gross receipts for such business for the six calendar months preceding the filing of each such statement. At the time of filing of each such statement the Comptroller shall examine the accuracy of such statement and shall certify to the License Collector of the City of St. Louis the amount of tax due by such person, firm or corporation engaged in the business described in Section One hereof. The License Collector shall thereupon notify the person, firm or corporation filing such statement, of the certification thereof, and such person, firm or corporation shall, within five (5) days, pay to the License Collector an amount equal to five per cent (5%) of the gross receipts as shown by the statement so filed and certified; Provided, however, that this tax shall not apply to any person, firm or corporation now or hereafter paying a gross receipts tax for the use and occupancy of streets and other public highways of the City of St. Louis.

"Section Three.—The tax herein required to be paid shall be in lieu of any other excise, license or occupation tax on any person, firm or corporation, engaged in the business described in Section One hereof, but nothing herein contained shall be so construed as to exempt any such person, firm or corporation from the payment to the City of St. Louis of the tax which the City of St. Louis levies upon any real or personal property belonging to any such person, firm or corporation.

"Section Four.—This being an ordinance fixing a tax rate, an emergency is hereby declared to exist within the meaning of Section 20 of Article IV of the Charter of the City of St. Louis, and this ordinance shall be effective immediately upon its passage and approval by the Mayor."

set up in its petition. The effect of this action by the plaintiff is to narrow the issue of estoppel to a consideration of only the second ground upon which the defendant relies, namely, estoppel in pais.

Under the provisions of Ordinance No. 41325, if applicable to the defendant, it was required to file on or before the 15th day of July, 1943, a statement of gross receipts for the six calendar months preceding the filing of the statement. The tenth count of the petition seeks recovery of a tax based upon the gross receipts for the first half of the year 1943.

On the 27th day of July, 1942, the plaintiff issued to the defendant a merchant's license which expired on the first Monday in July, 1943. This license authorized defendant to do business for a year ending "first Monday in July, 1943." The defendant had been paying a merchant's license tax since 1930, and on the passage of Ordinance No. 41325 continued to pay a merchant's license tax up to 1943. Some time prior to August 14, 1943, the defendant received a demand for merchant's license tax in the same manner in which it had been receiving like demands since 1930, and in accordance with the demand the defendant tendered its check, based on business done in the first half of 1943, to the plaintiff. It was this check which the plaintiff refused, and on August 14, 1943, returned to the defendant, and at the same time plaintiff made its first demand on defendant to make returns and pay taxes under Ordinance No. 41325.

■ It is a well recognized rule of law that to constitute estoppel in pais three things must occur:

First, a demand, statement or act inconsistent with the claim after it was asserted and sued on. Second, action by the other party on the filing of such demand, statement or act. Third, injury to such other party resulting from allowing the first party to contradict or repudiate such demand, statement or act. See Brown v. Brown, 347 Mo. 45, loc.cit. 48, 146 S.W.2d 553.

■ The notice and demand served on the defendant in 1943 to pay a merchant's license tax, preparatory to issuing a merchant's license ending in July, 1944, was inconsistent with its subsequent demand that the defendant pay a tax for the same period under Ordinance No. 41325, and furnishes the first requisite for estoppel in pais, but as to the claim set forth in the tenth count

of plaintiff's petition, do the facts meet the test as to the two remaining requirements to constitute an estoppel in pais?

The last merchant's license issued to defendant expired on the first Monday in July, 1943. While the plaintiff did demand that the defendant pay a merchant's license tax thereafter, this demand was annulled as of August 14, 1943, and the defendant took no action on the demand prior to that time. This leaves the second requisite for estoppel wanting.

As to the third requirement for estoppel in pais: Is there substantial evidence that loss will be sustained by the defendant if plaintiff is allowed to repudiate its previous demand for payment of merchant's license tax preparatory to issuing the 1943-44 merchant's license?

■ The defendant claims loss will result in three ways; first, that it paid income taxes on the basis of its obligation to the City under the merchant's license tax on the valuation of $1.25 per thousand of sales, rather than the five per cent claimed by the plaintiff under Ordinance No. 41325, and that its right to recover the difference in earnings based on the higher tax is doubtful. • As to this claim, the answer is that at the time demand was made of defendant for payment of tax under Ordinance No. 41325 based on business for the first half of 1943, no income tax return for the period had been made. Defendant's next claim of prospective injury is in the payment of dividends by it on the basis of earnings after deducting the one per cent tax on sales under the merchant's license tax rather than the five per cent demanded under Ordinance No. 41325—we are unable to determine accurately the date as of which dividends were paid, and in the absence of a definite statement to that effect we assume they were declared following the close of business for the calendar year 1943, and therefore the demand of taxes under Ordinance 41325 in August, 1943, based on the sales for the first half of 1943, was prior to any payment of dividends for earnings for the year 1943. Defendant's third claim of injury that it would sustain if plaintiff were permitted to repudiate its demand under the merchant's license tax ordinance and enforce claim under Ordinance No. 41325 results from the terms of its contracts

with its customers. It is defendant's position that under the contracts with its customers it was in a position to pass on to its customers any increase in cost of doing business resulting from defendant having to pay occupational, sales or similar taxes, and that the demand and notice of payment to pay tax under Ordinance No. 41325 was not made in time for the defendant to avail itself of the contract provisions in passing on this increased cost. All of the defendant's contracts with its industrial customers, with the exception of five, contained a provision that if at any time during the term of the contract the cost of gas to the defendant, as seller, be increased by reason of the defendant having to pay a tax of the character here under consideration "then at the option of defendant as seller, and upon six months' advance notice, if given within ninety days after the *imposition* of such tax, the defendant might cancel such contracts for the remainder of the term hereof."

The defendant's merchant's license issued in 1942 expired the first Monday in July, 1943. In applying for a new license it received notice on August 14, 1943, that the City was demanding a tax under Ordinance No. 41325. The basis of paying the tax demanded under Ordinance No. 41325, for the last half of 1943, was business done by the defendant during the first six months of the year 1943, but the tax was *imposed* as of July 1, 1943. We believe under the terms of the contracts referred to, defendant was then in a position to give notice of the imposition of the tax "within ninety days after the imposition of such tax," insofar as the first half of 1943 was concerned (same being the basis of the claim in count ten of the petition), and also in a position to cancel contracts "upon six months' advance notice" by giving the notice within the ninety day period, unless the purchaser elected to pay the additional cost of gas by reason of the increase in taxes.

As to the contracts cancellable on sixty days' written notice, and in one instance upon ninety days' written notice, we do not believe these provisions of the contract containing sixty and ninety day cancellation clauses can form the basis of estoppel in pais against the plaintiff under the circumstances of the case.

Defendant's position in this regard is stated in its brief:

"The recourse against customers under the terms of the contracts for increase in cost of gas to defendant is prospective only, e. g., only after the cost has been increased has defendant a remedy and that applies only to future increase in the cost, not past."

■ The earliest the tax under Ordinance No. 41325 and sued for under Count Ten of the petition could have been paid was on July 15, 1943. Demand for the tax within a month thereafter does not form the basis for estoppel in this case for the reasons stated.

■ The defendant (by reply brief filed after plaintiff had submitted findings of fact, conclusions of law and form of decree conceding that it is estopped to recover under Counts One to Nine of the petition) asserts that since it paid for and received a merchant's license to do business to the "first Monday of July, 1943," plaintiff's claim under Count Ten is in the same class as Counts One to Nine.

Ordinance No. 41325 does not provide that payment of the "license tax" therein provided, at the time provided, shall be for the privilege of doing business, or a use tax for a period preceding payment of the license tax. True the tax is computed on the basis of previous six months' business done, but the defendant has never paid any character of license tax to plaintiff on the basis of the business it did in the first half of 1943. The payment for the last merchant's license issued to the defendant was based on "sales made" by it during the calendar year "preceding the first Monday in June," 1942. Defendant was perfectly willing to and would have renewed its merchant's license by paying a tax based on business done during the first half of 1943, but for rejection of its tender by plaintiff. Then why should defendant object to payment of a license fee under Ordinance No. 41325 on the same basis?

■ II. Defendant asserts that its "business" does not come within the scope of Ordinance No. 41325. Whether this be true or not must be determined by the meaning of the following provision of Section One of the Ordinance:

"Every person, firm or corporation now or hereafter *engaged in the business* of

selling or distributing natural, artificial or mixed natural and artificial, gas *for heating, lighting, power and refrigeration,* in the City of St. Louis, shall pay * * *." (Emphasis added)

This is a taxing ordinance, and must be strictly construed. State ex rel. Compton v. Buder, 308 Mo. 253, 271 S.W. 770.

Under the record in this case the provisions of Ordinance No. 41325 refer to a particular business (gas), and the language of the ordinance above quoted, have a trade or particular meaning which those conversant with that business know and understand. This being the case, the Court is bound, in construing this ordinance, to give the language used the meaning as understood by the trade to which the ordinance applies. As was said in Hoffman v. Palmer, 2 Cir., 129 F.2d 976, loc. cit. 984: "Each trade has its peculiar jargon and courts rely on that jargon when it finds its way into a statute dealing with that trade."

In O'Hara v. Luckenbach S. S. Co., 269 U.S. 364, loc. cit. 371, 46 S.Ct. 157, loc. cit. 160, 70 L.Ed. 313, the rule is stated:

"If the act is one passed with reference to a particular trade, business, or transaction, and words are used which everybody conversant with that trade, business, or transaction, knows and understands to have a particular meaning in it, then the words are to be construed as having that particular meaning, though it may differ from the common or ordinary meaning of the words."

Decisions of the Supreme Court of Missouri are to the same effect. See Ex parte Bethurum, 66 Mo. 545, loc. cit. 548; Shelley v. Missouri Comm. for the Blind, 309 Mo. 612, loc. cit. 622, 274 S.W. 688. So construed, does the defendant come within the scope of the ordinance?

The conclusion is inescapable that Ordinance No. 41325 was passed, if not as a part of, at least in conformity with, an agreement "to dispose of present matters in controversy" between the plaintiff and the Laclede Gas Light Company, a public utility operating in the City of St. Louis. The agreement between the Laclede Gas Light Company and the plaintiff provided that the City would recommend "with the approval and consent of the Company" an Ordinance providing for five per cent gross receipt tax upon the sale of

artificial, mixed or natural gas *in form* "agreeable to both the Company and the City." This agreement was filed with the Public Service Commission on February 11, 1938. With it was filed a letter from the Mayor of plaintiff, dated December 20, 1937, which, among other things, stated that "the Company agrees to the payment to the City of a tax of five per cent upon its gross receipts. * * * An ordinance levying a tax of five per cent upon the Company's gross receipts in a form which the Company has agreed to accept will be introduced in the Board of Aldermen immediately." Next followed the introduction and enactment of Ordinance No. 41325 on May 17, 1938, which was in accord with the agreement between the Laclede Gas Light Company and the plaintiff.

That it was not the intention of the plaintiff, at the time the ordinance was enacted, to cover the business of the defendant by Ordinance No. 41325, is evident by the statement in the letter of the Mayor dated December 20, 1937: "Such a tax will produce approximately $325,000.-00 additional revenue for the City annually."

Ordinance No. 41325 was enacted in May of 1938, and it was not until August, 1943, that plaintiff made any effort of any character to enforce its provisions against the defendant. At the time Ordinance No. 41325 was enacted the City had knowledge of the defendant's operations in the City of St. Louis, which information resulted from litigation which had terminated. So much for the history of the ordinance and its purpose as evidenced by the circumstances surrounding its passage and subsequent conduct by the plaintiff.

In harmony with the circumstances surrounding the passage of the ordinance, and the history of its enforcement· (or lack of enforcement) subsequent to its passage and up to August, 1943, was the testimony of three expert witnesses offered by the defendant as to the meaning in the gas trade or business of the terms used in the ordinance. We take, for example, the testimony of R. E. Duffy, Chief Engineer of the Missouri Public Service Commission. Testifying in answer to a question whether the words "heating, lighting, power and refrigeration" have a particular

and accepted meaning in the gas industry, he testified that they do have, as follows:

"Q. What class of service do these terms apply to? A. Heating, in the ordinary practice in the sale of gas and use of gas by the public, applies to cooking, house-heating, small restaurant usage, commercial usage, and appliances of that kind.

"Q. The expression 'power', what is that used for? A. 'Power', in the gas industry, I might say is, historically—I might make it clearer this way—'Power' formerly, in the use of gas, applied mostly to the internal combustion engines. A number of years ago, there was some competition between the operators of gas properties and the operators of electrical industries in the sale of power to the retail customer. 'Power' at that time applied largely to the use of internal combustion engines as being in competition with the sale of power by electricity—by electrical utilities in the use of motors.

"Q. Now, is that still the term used in the industry for gas sold for power? A. It is.

"Q. And the term 'gas sold for heating, lighting and refrigeration' then, as I understand it, is the term used for domestic gas, gas sold for domestic purposes, and possibly to a certain limited extent to commercial? A. That is right."

There are three classifications used in the gas industry in describing the different types or kinds of use for gas. The same witness testified:

"Q. You have given three classifications, is that right? A. Lighting, heating, and power, and refrigeration. That is one set of classifications. Then sales to municipalities is another separate classification. Then industrial sales is another classification."

That the language used in the ordinance does not apply to gas sold for industrial purposes was further the testimony of this witness:

"Q. Now, in the gas parlance, in the gas business, does 'heating, lighting, power and refrigeration', when those terms are used, does that ever apply to gas sold for industrial purposes, in the parlance of the trade? A. No."

The witness examined the agreed statement of facts in this case, which details the use made of gas sold by defendant to each of its customers, and classifies such types and kinds of use as follows:

"Q. Will you state, please, sir, whether or not the uses as outlined therein are what is known to the trade as industriall uses? A. They are.

"Q. Or any other use? A. They are all industrial sales.

"Q. Are there any commercial or domestic gas sales listed, or purposes listed, in that statement? A. No."

That Ordinance No. 41325 properly described the business for which it was intended at the time of its passage, namely, that of Laclede Gas Light Company, as a public utility, is evidenced by the following testimony of this witness:

"Q. What type of business would you say the phrase 'heating, lighting, power and refrigeration' would be used, and for what type of business would that be used, the phrase, 'heating, lighting, and power, refrigeration'? * * * A. Yes, those are sales made by public utilities ordinarily considered under the regulation of the Commission.

"Q. Under the regulation of the Commission? A. Yes.

"Q. That is heating, lighting, power and refrigeration? A. That is right."

Two other experts in the gas industry, with a nationwide experience, gave testimony substantially the same as that of Mr. Duffy. This evidence is not contradicted.

To hold that the scope of Ordinance No. 41325 covered defendant's business would require the rejection by the Court of substantial undisputed testimony. Shall the Court substitute its judgment as to the meaning of terms used in the industry for that of experts, without any record whatever upon which the Court could base its findings? The testimony of the expert witnesses on the meaning of the terms used in the ordinance is in harmony with the conduct of the plaintiff prior to August, 1943. Plaintiff's conduct from 1938 to 1943 tends strongly to support the conclusion that the plaintiff, in passing this ordinance, intended to apply the ordinance to the business of the Laclede Gas Light Company, a public utility, and not defendant's business, and used language that made that application inevitable. The plaintiff, by its unexplained failure to make an effort to enforce the ordinance as to the

defendant between 1938 and 1943, was, in effect, by its action giving to the ordinance an interpretation in accord with and as understood by those in that industry. See City of St. Louis v. Laclede Gas Light Co., 155 Mo. 1, loc. cit. 20, 55 S. W. 1003, loc. cit. 1008, where the Court said:

"The contract sued on was executed in 1889, while no demand was made for the tax in question until 1895. This nonaction on the part of the city for so long a time after the execution of the contract, and the failure of the defendant and Brown to comply with what plaintiff claims was the terms thereof, must be regarded as so interpreting it that they were not legally bound by its terms to pay the 5 per cent. sued for."

See also State ex inf. McKittrick v. Springfield City Water Co., 345 Mo. 6, loc. cit. 22, 131 S.W.2d 525, loc. cit. 533.

To summarize, this Court is presented with an ordinance relating to a particular industry. According to those with knowledge of that industry, terms used in that ordinance have a definite and particular meaning. There is nothing appearing in the ordinance, nor in the history of its passage, to indicate the terms were used by the City Council in a sense different from that which has come to be common knowledge in the industry. Following passage of the ordinance for over five years the City adopts a policy in its enforcement of the ordinance indicating that its understanding of the terms used is the same as that of the industry to which the ordinance applies. This Court is without power to enlarge the scope of the ordinance.

"The settled rule of construction, since this is a taxing statute, is that it must be construed strictly. Its scope can be enlarged neither by implication nor by judicial amendment. St. Louis & S. F. Ry. Co. v. Apperson, 97 Mo. 300, 10 S.W. 478, 480, 481; Smietanks v. First Trust & Savings Bank, 257 U.S. 602, 606, 42 S.Ct. 223, 66 L.Ed. 391." City of St. Louis v. Mississippi River Fuel Corp., 8 Cir., 97 F. 2d 726, loc. cit. 728.

Plaintiff argues that the term "heating" is used in the ordinance, and the defendant's customers use the gas for "heating" in their manufacturing processes, and therefore it should be held to apply to defendant's business. This argument overlooks the language of the ordinance. It is the use of the word "heating" in connection with the other language of the ordinance ("heating, lighting and refrigeration") that constitutes the term, defined by expert witnesses as applying *only* to "gas sold for domestic purposes" and not to the "business" defendant is engaged in, namely, the selling of gas for "industrial" purposes.

Nor is it an answer to defendant's position now being considered for plaintiff to urge that the Laclede Gas Light Company sells some gas for "industrial purposes" along with sales for domestic purposes, common to purchasers of gas of a public utility, and pays a tax on the gas sold for "industrial" purposes under the terms of Ordinance No. 41325. It was the testimony of the witnesses who testified as experts, as to the meaning of the terms used in the ordinance, that they applied to the business of the Laclede Gas Light Company. Furthermore, the Laclede Gas Light Company must have agreed to the terms of the ordinance and accepted its provisions prior to the passage of the ordinance, in accord with the contract entered into by it and the plaintiff, whereby the Laclede Gas Light Company agreed to pay a five per cent gross receipts tax on the passage of the ordinance. The contract between the plaintiff and the Laclede Gas Light Company provided that the ordinance would be "in a form agreeable to both the company and the City".

Had the City desired to have the ordinance cover the business of defendant, it could very easily have written the ordinance to cover defendant's operations. The City was passing an ordinance applicable solely to those in the business of distributing and selling gas. Instead of passing an ordinance covering the business of defendant, the City wrote into the ordinance a phrase or classification which, in the gas trade or industry, has a very definite and accepted meaning. In the language of the decision of the Court of Appeals for the Eighth Circuit, in the case of the City of St. Louis v. Mississippi River Fuel Corporation, 97 F.2d 726, loc. cit. 728: "Why did the Board of Aldermen use this qualifying phrase?" In view of the record made in this case, and the undisputed testimony as to the meaning of the term used, we can only conclude that it was because the plaintiff did not intend to cover the business of defendant.

Plaintiff's brief recites under this heading:

"There can be no basis for the conclusion that the City of St. Louis intended the tax to apply to only those who are engaged in selling gas to the public. In former litigation with the Mississippi River Fuel Corporation the court declared they were not subject to the tax because they were not engaged in a public enterprise as a public utility. In the drafting of the ordinance in question this provision of the former ordinance was omitted for the sole purpose of obviating the reason assigned by the court for excluding the defendant in this case under the former ordinance."

Aside from this declaration in the brief, that plaintiff had in mind defendant when Ordinance No. 41325 was drafted, we find no evidence to sustain the contention. If such were in fact the purpose of the City, or one of the purposes in drafting Ordinance No. 41325, then it reflects no credit upon the City that it waited from 1938 until 1943 to inform defendant of its intentions toward it. Likewise, this claim of the plaintiff is inconsistent with its repeated demands upon the defendant to pay a merchant's license tax.

We think there can be no argument but what the defendant is engaged in selling gas for industrial purposes. The record supports this contention of the defendant, and plaintiff's brief does not challenge it, if it does not concede it. The fact that a small portion of defendant's product is used by its customers for space heating does not change defendant's business from that of selling gas for "industrial" purposes to that of selling "gas for lighting, heating, power and refrigeration." The ordinance is a tax imposed upon those "engaged in the business" of selling gas for "lighting, heating, power and refrigeration." The ordinance does not undertake to place the tax upon that portion of the gas used for each individual purpose. The business of the defendant is not the selling of "gas for heating, lighting, power and refrigeration"; the business of defendant is the sale of gas for "industrial" purposes. Defendant does not come within the scope of the ordinance.

III. The defendant urges under this division of its brief the defense that there is no provision in the City charter authorizing passage of the ordinance. Section 7440, R.S.Mo. 1939, Mo.R.S.A., is a limitation upon the power of the City to impose a license tax on any business unless such business is specifically named as tax-able in the Charter. Article 20 of the Charter of the City provides "License taxes may be imposed by ordinance upon merchants * * * gas companies, * * *." We believe the charter provision broad enough to include gas companies operating as public utilities and gas companies operating as private enterprises, and making sales only to selected contract customers, such as the defendant in this case.

IV. The defendant next assails Ordinance No. 41325 on the ground that it violates Article X, Section 3, of the Constitution of Missouri, Mo.R.S.A., which requires that taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax. Specifically, the position of the defendant is that the exemption in Ordinance No. 41325 of those engaged in the business described, if they use the streets of the City and are paying a rental to the City therefor, constitutes an unconstitutional classification. Defendant claims that this provision of the ordinance not only violates the Constitution of Missouri, but also Section One of the Fourteenth Amendment to the Constitution of the United States providing for due process and equal protection to all citizens.

The Court having held Ordinance No. 41325 inapplicable to the business of defendant because defendant's business is not within the scope of the business described in the ordinance, it is not necessary to a determination of the case that the constitutional question here presented be passed upon. For that reason we will not do so. Arkansas Louisiana Gas Co. v. Department of Public Utilities, 304 U.S. 61, loc.cit. 64, 58 S.Ct. 770, 82 L.Ed. 1149.

V. Defendant's fifth defense is that its operations in the City of St. Louis constitute interstate commerce, and that Ordinance No. 41325, if applied to its operations in the City of St. Louis, would constitute an attempt to regulate and put a burden on interstate commerce, and therefore is repugnant to the commerce clause of the Constitution of the United States, Article 1, § 8, cl. 3. A constitutional question is thus presented, not only as to whether defendant's operation and sale of gas in the City of St. Louis constitute interstate commerce, but whether, if they do, the interference and burden resulting, if any, is direct or so indirect and of such minor importance as not to contravene the prohibition of the Federal Constitution. Eureka

Pipe Line Co. v. Hallanan, 257 U.S. 265, loc.cit. 270, 42 S.Ct. 101, 66 L.Ed. 227; East Ohio Gas Co. v. Tax Commission, 283 U.S. 465, loc.cit. 472, 51 S.Ct. 499, 75 L.Ed. 1171. The decision of the question thus presented not being necessary to a determination of the case, for that reason we do not pass upon it.

### Findings of Fact

I. The plaintiff, the City of St. Louis, is a municipal corporation organized and existing under the laws of the State of Missouri; the defendant, Mississippi River Fuel Corporation, is a corporation organized and existing under the laws of the State of Delaware, and a citizen of that State, and the amount involved in this action exceeds the sum of Three Thousand Dollars ($3,-000), exclusive of interest and costs.

II. Article XX of the Charter of St. Louis lists "gas companies" as subject to levy of license taxes. It also lists "merchants" as so taxable.

At all times during the period of time covered by the petition, there were in force in said City Ordinance No. 41325, correctly set forth in the petition, and Ordinance No. 40787, as amended by Ordinance No. 41326, which are as follows:

Ordinance No. 41325:

"An ordinance providing for a license tax to be paid by persons, firms, or corporations engaged in the business of distributing and selling natural, artificial, or mixed natural and artificial, gas for heating, lighting, power and refrigeration in the City of St. Louis, and containing an emergency clause.

"Be it ordained by the City of St. Louis, as follows:

"Section One.—Every person, firm or corporation now or hereafter engaged in the business of selling or distributing natural, artificial, or mixed natural and artificial, gas for heating, lighting, power and refrigeration in the City of St. Louis shall pay the City of St. Louis, as a license tax, a sum equal to five per cent. (5%) of the gross receipts from such business.

"Section Two.—It is hereby made the duty of every person, firm or corporation engaged in the business described in Section One hereof to file with the Comptroller of the City of St. Louis, on the 15th day of July, 1938, a sworn statement of gross receipts of such person, firm or corporation for such business from the effective date of this ordinance to July 1, 1938, and to file thereafter on the 15th day of January and July of each year a sworn statement of gross receipts for such business for the six calendar months preceding the filing of each such statement. At the time of filing of each such statement the Comptroller shall examine the accuracy of such statement and shall certify to the License Collector of the City of St. Louis the amount of tax due by such person, firm or corporation engaged in the business described in Section One hereof. The License Collector shall thereupon notify the person, firm or corporation filing such statement, of the certification thereof, and such person, firm or corporation shall, within five (5) days, pay to the License Collector an amount equal to five per cent. (5%) of the gross receipts as shown by the statement so filed and certified; Provided, however, that this tax shall not apply to any person, firm or corporation now or hereafter paying a gross receipts tax for the use and occupancy of streets and other public highways of the City of St. Louis.

"Section Three.—The tax herein required to be paid shall be in lieu of any other excise, license or occupation tax on any person, firm or corporation engaged in the business described in Section One hereof, but nothing herein contained shall be so construed as to exempt any such person, firm or corporation from the payment to the City of St. Louis of the tax which the City of St. Louis levies upon any real or personal property belonging to any such person, firm or corporation."

(Effective date clause omitted.)

Ordinance No. 40787, as amended by Ordinance No. 41326:

"An ordinance providing for a tax to be paid by persons, firms or corporations engaged in the business of distributing and selling natural, artificial or mixed natural and artificial, gas for heating, lighting, power or refrigeration for public use in the City of St. Louis, as a tax for the use and occupation of the streets and other public highways of the City of St. Louis by such persons, firms or corporations for their distribution systems, and containing an emergency clause.

"Be it ordained by the City of St. Louis, as follows:

"Section One.—Every person, firm or corporation engaged in the business of distributing and selling natural, artificial, or mixed natural and artificial, gas for heating, lighting, power and refrigeration for public use in the City of St. Louis, through

pipe lines laid in the streets and other public highways of said city, shall pay to the City of St. Louis a tax equal to five per cent (5%) of the gross receipts from such business as a tax for the use and occupation of the streets and other public highways of the City by such person, firm or corporation for its distribution system.

"Section Two.—It is hereby made the duty of every person, firm or corporation engaged in the business of distributing and selling natural, artificial, or mixed natural and artificial, gas for heating, lighting, power, and refrigeration, for public use in the City of St. Louis, to file with the Comptroller of the City of St. Louis, on the first day of January, 1936, a statement of the gross receipts of such person, firm or corporation from such business from the effective date of this ordinance, and on the first day of January and July of each year thereafter, to file with the Comptroller of the City of St. Louis a statement of the gross receipts of such person, firm or corporation from such business for the six months immediately preceding the filing of each such statement. At the time of filing each such statement herein required, such person, firm or corporation shall also pay into the treasury of the City of St. Louis an amount equal to five per cent (5%) of the gross receipts shown by the statement filed.

"Section Three.—The tax herein required to be paid shall be a tax on the use and occupation of the streets and other public highways of the City of St. Louis for the pipe lines of the distributing system of persons, firms, or corporations engaged in the business of distributing and selling natural, artificial, or mixed natural and artificial, gas, for heating, lighting, power and refrigeration of public use in the City of St. Louis, and nothing herein contained shall be so construed as to exempt any such person, firm or corporation from the payment to the City of St. Louis of a manufacturer's and merchant's excise tax, nor from the payment of the tax which the City of St. Louis levies upon any real or personal property or franchise belonging to any such person, firm, or corporation. Provided, however, that nothing herein contained shall apply to any person, firm or corporation now or hereafter engaged in the business of distributing and selling natural, artificial, or mixed natural and artificial, gas for heating, lighting, power, or refrigeration for public use in the City of St. Louis under authority originally conferred by the General Assembly of the State of Missouri."

During all of said period there were also in force ordinance provisions levying a tax of $1.25 per thousand upon gross receipts from sales by merchants, requiring a license for such, under penalty, and the payment of this tax annually as a condition precedent to the issuance of such license for the next succeeding year. Revised Code of City of St. Louis 1936, Secs. 1395 to 1406, inclusive.

III. The defendant is engaged in operating a pipe line from natural gas fields in the State of Louisiana. The main transmission line extends from the gas fields to a point south of the City of St. Louis known as Meramec Junction, Missouri, where it is divided into the Illinois division line and the Missouri division line. The Illinois division line crosses the Mississippi River and extends north to the City of Alton with a branch re-crossing the river and extending a short distance into the northern part of the City of St. Louis. This division line delivers gas both to customers in Illinois and in the City of St. Louis, Missouri. The Missouri division line extends northward into the City of St. Louis . The pressure of the gas in the main transmission line at Meramec Junction varies from two hundred to three hundred pounds per square inch. As it passes into the Missouri division line the pressure is reduced to approximately 125 pounds and at the terminus of that line in St. Louis the pressure is approximately 75 pounds. The gas passes into the Illinois division line at a higher pressure because the customers on that line take more gas. The gas is sold and delivered to selected industrial and utility customers and delivered to such customers through and by means of laterals constructed by the defendant from its pipe line to the premises of the particular customer. Defendant does not function as a utility and sells no gas to the public. Its pipe line is laid on private rights-of-way and occupies no public property with the exception of streets and alleys under which it crosses. Defendant sells gas only in accordance with contracts previously executed with the customer, whether utility or industrial. These contracts provide that the gas is to be brought from the Louisiana gas fields by pipe line and delivered therefrom to the purchaser who assumes the risks to his operations from a breakdown in supply in the field or in transportation therefrom.

The defendant has field employees who visit the customers' plants in the City of St. Louis and elsewhere to observe what appliances are in use and to make inquiries as to what appliances requiring gas may be in use within the next few succeeding days, from which they estimate the amount of gas that will be necessary to meet the customers' requirements. The data gathered by these field employees is transmitted to the defendant's dispatcher's office at Meramec Junction and there assembled with other information, and based thereon, instructions are sent daily to the intake station in Louisiana as to the amount of gas to take from the sellers in the field during the next twenty-four hours to meet the requirements of defendant's customers.

In the main transmission line the gas is compressed at intervals to expedite the flow and increase the capacity of the line. On the two division lines leading from Meramec Junction regulators are installed which automatically open and close to admit the passage of gas necessary to supply all customers taking gas from the line at the time. At intervals laterals lead from the division line to the premises of the customer. At the terminals of this lateral connecting on one side with the lateral and on the other with the receiving appliances of the customer, is a meter to measure the gas taken by the customer, and by the terms of the contracts the outlet of this meter is the delivery point. At this same point, and before the gas reaches the meter, its pressure is again reduced by passing through the defendant's regulator which is set to permit the flow of gas at a pressure sufficient to meet the customer's requirements which ranges from 20 to 58 pounds per square inch, although some of defendant's contracts provided for delivery at a much lower pressure. The same method of delivery and the same or equivalent appliances are in use throughout the industry. Its contract with the Missouri Rolling Mill Corporation provided for defendant to install, maintain and operate a meter, or meters, on the customer's line after delivery to measure gas that is segregated for a specific use and sold at a different price. Where gas is delivered to an industry the amount delivered is controlled by the valves at the burners. When the valves are open at the burners the pressure between the burners and the customer's regulator is reduced which causes the customer's regulator to open and gas to flow through it. This reduces the pressure in the line between the customer's regulator and the defendant's regulator which, in turn, causes defendant's regulator to open and permit gas from the defendant's supply line to pass through it and into the customer's line at the point of delivery. The regulators at Meramec Junction function in the same manner; that is, as gas is consumed on the division lines the pressure of the gas toward the point of consumption is reduced which causes the regulator to open and permits the passage into the division lines of gas sufficient to replace that consumed, and to bring the pressure in the division lines up to the point at which the regulators are set.

The defendant operates no storage tanks or holders and stores no gas except that in its lines and laterals. It can increase the amount of gas in these lines and laterals by passing into them more gas than is being withdrawn and increasing its pressure. The gas is not delivered at a pressure at which it is usable without the pressure being further reduced, and industrial customers operate their own appliances for that purpose. The gas moves through the main transmission line in bulk and there is no segregation of particular gas for a particular customer, whether industrial or utility, until it moves into the lateral past the meter for delivery to such customer. Any earlier segregation for the use of a particular customer is impractical and is not done in the industry. When gas is delivered into the Missouri division line at Meramec Junction, Missouri, it is segregated from the bulk in defendant's main transmission line for the aggregate use of the customers on the Missouri division line, and when gas is passed into the Illinois division line at that Junction it is segregated from the bulk in defendant's main transmission line for the aggregate use of the customers on the Illinois division line, some of which are located in the City of St. Louis.

During the time involved in this litigation the defendant deposited the proceeds of gas sold in St. Louis, partly in a bank in the City of St. Louis and partly in a bank in the City of New York. A large part of the St. Louis deposits was at intervals transferred to the New York bank. When checks representing the proceeds of these sales were deposited in St. Louis, they were endorsed by an officer of the Company connected with defendant's St. Louis operating office, in which the records of defendant's

transactions for the sale of gas in Missouri are kept. Checks for the payment of gas purchased by the defendant were issued in New York and drawn on its New York bank account. Salaries and other expenses of the operating office in St. Louis were paid from the account carried in the St. Louis bank and checks therefor were drawn by the operating office in St. Louis.

IV. In the gas industry the ordinary and usual classification as to purposes for which gas is sold is domestic, commercial and industrial. In the industry the words "sale of gas for heating, lighting, power and refrigeration" have a definite and accepted meaning. They denote the sale of gas by a utility to the public for domestic and commercial purposes. "Heating" as used in this phrase denotes gas sold for cooking, hot water heating, space heating and similar uses by small commercial users; "lighting" denotes illumination; "refrigeration" denotes the furnishing of heat in the operation of certain types of refrigerators, and "power" denotes the sale of gas for use in internal combustion engines.

The term "sale of gas for heating, lighting, power and refrigeration" does not denote or include industrial gas. "Industrial gas" is gas sold to industries and means the sale of gas, usually in large quantities, to manufacturers for use in the production of commodities for sale.

V. The sales described in the petition as having been made by the defendant, during the periods described, were all made by the defendant to industrial customers operating in the City of St. Louis. The amount of such sales is accurately set forth in the petition. These sales were for uses by the customers which are thus to be classified and described:

Use as a fuel for hardening purposes in the manufacture of clay products, such as brick, tile, sewer pipe and the like;

Use as a fuel for firing boilers for the production of steam for use as power in various and sundry manufacturing and industrial processes;

Treating steel, brass and lead in the course of producing articles manufactured therefrom;

Drying lacquers and varnish applied to manufactured products;

The application of galvanizing material to manufactured products;

Heating core ovens for foundry purposes;

Melting babbitt metal;

Torches for cutting and soldering;

Tempering tools;

Drying paint after its application to manufactured articles.

The gas thus sold is known in the industry as industrial gas.

Some of these customers used gas, not only for their particular industrial process, but to a limited degree for space heating in the factory or some part thereof, and for water heating. This use was incidental to the industrial use for which the gas was engaged and bought by the customer. The gas devoted to such use by the customer was not separately metered to the customer. In the period covered by the petition the defendant's total sales to these industrial customers was $4,525,192.94. Of this total, not exceeding $92,545.79 represents the purchase price of the gas devoted by some of these customers to space and hot water heating.

The business carried on by defendant in connection with the sale of gas described in plaintiff's petition, was that of selling gas for industrial purposes, and not for heating, lighting, power and refrigeration.

VI. During the entire period covered by the petition, except the year 1943 and the last half of 1942, the plaintiff demanded, collected and received from the defendant a merchant's license tax of $1.25 per thousand of its gross receipts from these same sales to these same industrial customers. These collections the plaintiff has never returned or offered to return to the defendant. During said period the plaintiff had full knowledge of the nature of defendant's business and operations. During this period the defendant had contracts with all of its industrial customers (save for a portion of the time in certain contracts with five customers), whereby, in case a tax increased the cost to the defendant of the gas sold, the defendant might require the customer to assume the tax or submit to a cancellation of the contract. This remedy was not available to the defendant as to the taxes here in suit that were imposed prior to July 1943. During the same period the defendant annually returned its net income to the State and Federal Government for taxation, claiming no deduction for gross receipts taxes to the City of St. Louis save only the merchant's license

tax, and paid its income taxes accordingly. During the same period it paid dividends to its shareholders on the same basis.

At the date of the enactment of Ordinance No. 41325 on May 17, 1938, and ever since that time, the Laclede Gas Light Company is the only person, firm or corporation engaged in the business of selling gas in the City of St. Louis except the defendant herein, and during that time has returned its sales for taxation.

## Conclusions of Law

A. The Court has jurisdiction of the parties and the subject matter of the action.

B. This is an action at law, and the plaintiff must have had a completed cause of action when it was instituted. Having collected a merchant's license tax on the defendant's gross receipts for each year in suit, except for the year 1943 and the last half of 1942, the plaintiff cannot sue for a recovery of a different gross receipts tax for the same period, without having first returned or tendered the taxes collected.

C. The plaintiff, having demanded and collected a merchant's license tax on the gross sales of gas by the defendant, as aforesaid, is estopped from demanding or collecting a license tax under Ordinance No. 41325 for the gross sales of gas for the period prior to the first of July, 1942.

D. The Charter of the City of St. Louis authorizes it to impose license taxes on gas companies, and the defendant is a gas company within the meaning of said charter provision.

E. The word "heating" as used in Ordinance No. 41325, both by context and ordinary understanding, is limited to space heating, usually of residences and small business establishments, and such use by a few of defendant's industrial customers is incidental to the industrial use of the gas, and does not bring the defendant within the terms of the ordinance as one engaged in the business of selling gas for space heating. The business of the defendant is not the selling of gas for lighting, power, or refrigeration, but the distribution and selling of gas for industrial purposes. In the gas industry, the selling of gas for lighting, power or refrigeration has a definite and particular meaning as referring to a certain type of gas business and does not designate or include the business of the defendant.

F. When a legislative act is passed with reference to a particular trade or business, and words are used which those conversant with the trade or business know and understand to have a particular and definite meaning, then the words are to be construed as having that particular and definite meaning, though such meaning may differ from the common or ordinary meaning of the words.

G. Ordinance No. 41325 is a taxing statute and it must be strictly construed. Its scope can not be enlarged either by implication or judicial amendment.

H. The business of defendant, in the distribution and selling of gas for industrial purposes in the City of St. Louis, does not come within the scope of Ordinance No. 41325. Defendant does not distribute or sell gas for lighting, power and refrigeration, as those terms are used in the ordinance, in the City of St. Louis.

I. Under the facts found and the conclusions of law here made, the finding and judgment should be for the defendant and against the plaintiff on each count of the plaintiff's petition.

## Judgment

This cause having been heretofore tried and submitted and taken under advisement, the Court, being now fully advised of and concerning the premises, and having made and filed its findings of fact and conclusions of law herein, doth find for the defendant on each count of the plaintiff's petition, and that the plaintiff is not entitled to recover for the taxes sued for herein.

It is therefore ordered, adjudged and decreed by the Court that the plaintiff take nothing by its writ herein, and that the defendant go hence without day and recover of and from the plaintiff its costs herein, for which let execution issue in due course.