## O'HARA ET AL. *v.* LUCKENBACH STEAMSHIP COMPANY.

CERTIORARI TO THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 224. Argued November 19, 1925.—Decided January 4, 1926.

1. Under the requirement of the Seamen's Act of March 4, 1915, that "the sailors shall, while at sea, be divided into at least two, and the firemen, oilers and water tenders into at least three watches, which shall be kept on duty successively for the performance of ordinary work incident to the sailing and management of the vessel," all the sailors must be divided into watches as nearly equal to each other numerically as the whole number of sailors will permit. P. 367.

2. The purpose of this provision, as shown by the Act and its history, is to promote safety at sea rather than to regulate the working conditions of the men. *Id.*

3. The phrase "divided into watches" is to be given the meaning it had acquired in the language and usages of the nautical trade—connoting a division of the crew as nearly equal as possible. P. 370.

1 Fed. (2d) 923, reversed.

CERTIORARI to a decree of the Circuit Court of Appeals which affirmed a decree of the District Court dismissing a libel for seamen's wages.

*Mr. H. W. Hutton,* for petitioners.

*Mr. Peter S. Carter,* with whom *Messrs. Louis T. Hengstler* and *Frederick W. Dorr* were on the brief, for respondent.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

Petitioners, libellants below, quit the service of the steamship company and sought to recover their earned wages on the ground of a violation of § 2 of the Seamen's Act of March 4, 1915, c. 153, 38 Stat. 1164, copied in the margin.[1]   Omitting the various provisions with which we

---

[1] " SEC. 2. That in all merchant vessels of the United States of more than one hundred tons gross, excepting those navigating rivers, harbors, bays, or sounds exclusively, the sailors shall, while at sea, be divided into at least two, and the firemen, oilers, and water tenders into at least three watches, which shall be kept on duty successively for the performance of ordinary work incident to the sailing and management of the vessel.  The seamen shall not be shipped to work alternately in the fireroom and on deck, nor shall those shipped for deck duty be required to work in the fireroom, or vice versa; but these provisions shall not limit either the authority of the master or other officer or the obedience of the seamen when, in the judgment of the master or other officer, the whole or any part of the crew are needed for the maneuvering of the vessel or the performance of work necessary for the safety of the vessel or her cargo, or for the saving of life aboard other vessels in jeopardy, or when in port or at sea from requiring the whole or any part of the crew to participate in the performance of fire, lifeboat, and other drills.  While such vessel is in a safe harbor no seaman shall be required to do any unnecessary work on Sundays or the following-named days: New Year's Day, the Fourth of July, Labor Day, Thanksgiving Day, and Christmas Day, but this shall not prevent the dispatch of a vessel on regular schedule or when ready to proceed on her voyage.  And at all times while such vessel is in a safe harbor, nine hours, inclusive of the anchor watch, shall constitute a day's work.  Whenever the master of any vessel shall fail to comply with this section, the seamen shall be entitled to discharge from such vessel and to receive the wages earned.  But this section shall not apply to fishing or whaling vessels, or yachts."

are not here concerned, the pertinent requirement of that section is that " the sailors shall, while at sea, be divided into at least two, and the firemen, oilers, and water tenders into at least three watches, which shall be kept on duty successively for the performance of ordinary work incident to the sailing and management of the vessel." For a failure on the part of the master to comply with this, among other provisions of the section, the seamen are entitled to a discharge and to receive the wages earned. The failure complained of was that the sailors were not divided into watches of equal or approximately equal numbers, as, it was insisted, the statute contemplated.

The company was the owner of the steamship " Lewis Luckenbach," a vessel of 14,400 tons burden, upon which libellants were hired as sailors for a voyage from New York to Pacific ports and return to some port north of Cape Hatteras on the Atlantic. Altogether, there were thirteen sailors on board, three of whom, including libellants, were assigned as quartermasters. On the voyage and while at sea, these sailors were not equally divided into watches. Three watches were on duty, each consisting of one quartermaster and one able seaman, the remaining seven sailors being kept at day work only. The district court dismissed the libel and this was affirmed by the court of appeals. 1 Fed. (2nd) 923. Both courts were of opinion that the primary object of the statutory provision was to fix hours of service so as to prevent overwork, not to prescribe the number of seamen on each watch. The district court thought that this conception of the law was borne out by the consideration that, if one-half or one-third of the crew must be assigned to duty at night, a majority of them would have little or nothing to do. The court of appeals seemed to think that the purpose of Congress to provide for the safety of the ship was satisfied rather in the selection of qualified quartermasters and men for the lookout than in the equality of the watches. With these views we are unable to agree.

· The general purpose of the Seamen's Act is. not only
to safeguard the welfare of the seamen as workmen, but,
as set forth in the title, also "to promote. safety at sea."
The Act as a whole shows very clearly that, while hours of
work and proper periods of rest were regarded as consid-
erations of primary concern while the vessel is in a safe
harbor, these considerations must yield, as they have al-
ways yielded, to the paramount necessity of safety while
the ship is at sea. And, as indicating that the provision
under review was not intended primarily as a regulation
of working hours, it is significant that it does not apply
to the entire crew, but requires a division into watches
only of the sailors and the firemen, oilers and water
tenders. It is natural to suppose that if the purpose of
Congress was chiefly to regulate hours of work, some-
thing would have been said about the service, while at
sea, of those employed in the steward's department as
well. And not only is the division confined to those of
the crew engaged in the mechanics of conducting the
ship on her voyage, but the imperative requirement is
that the watches into which they are divided "shall be
kept on duty successively," that is to say by turns, so
that one watch must come on as another goes off. The
evident purpose was to compel a division of the men for
duty on deck and in the fireroom and continuity of serv-
ice, to the end that in those departments the ship should
at all times be actively manned with equal efficiency. It
probably is true, as said below, that to construe the statute
as compelling numerical equality of the watches will
result, so far as the sailors are concerned, in the perform-
ance of less work on deck at night. And it may be noted,
in that connection, that in the hearings before the House
committee having charge of the bill, it was objected on
behalf of the shipowners, obviously, as the context shows,
upon the theory that such equality was in fact contem-
plated by the provision, that, "on cargo steamers, it would

be an injustice to keep a lot of men on watch, all night, and have nothing for them to do." House Hearings on S. 136, Vol. 104, pt. 2, p. 5, Feb. 24, 1914. But the provision, fundamentally, is a measure of precaution against those perilous and often unexpected emergencies of the sea when only immediate and wakeful readiness for action may avert disaster or determine the issue between life and death; its effect as a regulator of working conditions is a matter of subordinate intent. A consideration of other safety provisions of the Act will help to make this clear.

Among them, the Act (§ 13, p. 1169) provides that not less than seventy-five per centum of the crew in each department shall be able to understand any order given by the officers of such vessel; and that a certain percentage of her deck crew shall be of a rating not less than able seaman—meaning, except on the Great Lakes, a seaman nineteen years of age or upwards who has had at least three years' service on deck at sea or on the Great Lakes. It also contains elaborate provisions (§ 14, pp. 1170–1184) for the equipment of ocean-going vessels with life-saving appliances, and, among other things, requires (p. 1180) that "At no moment on its voyage may any ocean-cargo steam vessel of the United States have on board a total number of persons greater than that for whom accommodation is provided in the lifeboats on board." None of these provisions is of much if any concern except as a precaution against the unusual crises of the sea.

As a ship pursues her way in security, perhaps for many years, these requirements for safety appliances and for able seamen may seem over-exacting, and the language test, as well as a division of the watches into equal numbers, needlessly burdensome. But it is apparent from the hearings and debates, that Congress looked forward to the possibility of other disasters like those of the

*Titanic* and the *Volturno*, (the facts of which had been subjected to inquiry by its committees) where, in the one, the lack of lifeboats probably caused the loss of many lives, although in a quiet sea, and where, in the other, lifeboats lowered in a great storm were engulfed, it was thought by some, from the absence of the skill of able seamen in launching them; or like that of the *City of Rio de Janeiro* (*In re Pacific Mail S. S. Co.*, 130 Fed. 76), which sank with many of its lifeboats unlaunched because the crew of Chinese sailors were unable to understand the language in which the orders of their officers were given. The following from the opinion in that case (pp. 82–83) is peculiarly apposite:

" It is, as was said by Judge Hawley in *Re Meyer* (D. C.) 74 Fed. 855, ' the duty of the owners of a steamer carrying goods and passengers, not only to provide a seaworthy vessel, but they must also provide the vessel with a crew adequate in number, and competent for their duty with reference to all the exigencies of the intended route '; not merely competent for the ordinary duties of an uneventful voyage, but for any exigency that is likely to happen, . . . The-case shows that the City of Rio de Janeiro left the port of Honolulu, on the voyage under consideration, with a crew of 84 Chinamen, officered by white men. The officers could not speak the language of the Chinese, and but two of the latter—the boatswain and chief fireman—could understand that of the officers. Consequently, the orders of the officers had to be communicated either through the boatswain or chief fireman, or by signs and signals. So far as appears, that seemed to have worked well enough on the voyage in question, until the ship came to grief, and there arose the necessity for quick and energetic action in the darkness. In that emergency the crew was wholly inefficient and incompetent, as the sad results proved. The boats were in separate places on the ship. The sailors could not understand

the language in which the orders of the officers in command of the respective boats had to be given. It was too dark for them to see signs (if signs could have been intelligibly given), and only one of the two Chinese who spoke English appears to have known anything about the lowering of a boat; and there had been no drill of the crew in the matter of lowering them. Under such circumstances it is not surprising that but three of the boats were lowered, one of which was successfully launched by the efforts of Officer Coghlan and the ship's carpenter, another of which was swamped by one of the Chinese crew letting the after fall down with a run, and the third of which was lowered so slowly that it was swamped as the ship went down. We have no hesitation in holding that the ship was insufficiently manned, for the reason that the sailors were unable to understand and execute the orders made imperative by the exigency that unhappily arose, and resulted so disastrously to life, as well as to property."

See also R. S. § 4463, amended c. 72, 40 Stat. 548; *Flint & P. M. R. Co.* v. *Marine Ins. Co.,* 71 Fed. 210, 219; *Northern Commercial Co.* v. *Lindblom,* 162 Fed. 250, 254.

It is not unreasonable to conclude that Congress determined that each of the watches, like the crew as a whole, should be "adequate in number," competent and in a state of readiness "for any exigency that is likely to happen"— such as a collision, the striking of the ship upon a reef of rocks or an iceberg, the sudden breaking out of fire, and other happenings of like disastrous tendency—and to this end meant to provide for successive and continuous watches to be constituted in numbers as nearly equal as the sum of the whole number would permit.

In this conclusion we are fortified by the consideration that the legislation deals with seamen and the merchant marine and, consequently, the phrase "divided into . . . . watches" is to be given the meaning which it had acquired in the language and usages of the trade to which the Act relates, in accordance with the rule stated in *Unwin* v.

*Hanson,* [1891] L. R. 2 Q. B. 115, 119: " If the Act is one passed with reference to a particular trade, business, or transaction, and words are used which everybody conversant with that trade, business, or transaction, knows and understands to have a particular meaning in it, then the words are to be construed as having that particular meaning, though it may differ from the common or ordinary meaning of the words." In the understanding of the sailor, a division into "watches," as applied to the personnel of the ship, connotes a division as nearly equal as possible. "At sea a ship's crew is commonly divided into two watches; the Master, 2nd Mate, 4th Mate (if any) with one-half of the seamen and boys, forming the so-called 'Starboard Watch'; after four hours these are relieved by the Chief-mate, and the 3rd Officer (if any) and the other half of the men, who form the 'Port Watch'." Paasch, Marine Encyclopedia, 300, 301. R. H. Dana, Jr., in his " Dictionary of Sea Terms," p. 129, defines the term "watch" as: "Also, a certain portion of a ship's company, appointed to stand a given length of time. In the merchant service all hands are divided into two watches, larboard and starboard, with a mate to command each." And, at page 133, he says: " The men are divided as equally as possible, with reference to their qualities as able seamen, ordinary seamen, or boys, (as all green hands are called, whatever their age may be;) but if the number is unequal, the larboard watch has the odd one, since the chief mate does not go aloft and do other duties in his watch, as the second mate does in his." The point is emphasized by the use of the distinctive terms "anchor watch " and " sea watch ", the former meaning the lookout entrusted to one or two men when the vessel is at anchor and the latter being used " when one half of a ships crew is on duty" at sea. Paasch, 301.

It is true that this meaning had its origin in the customs of the sea before the advent of steam, but there is nothing

to show that it has now a different meaning; and, with nothing in the context and no evidential circumstances to suggest the contrary, we fairly may assume that the use of the technical terms of the trade to which the statute relates imports their technical meaning.

*Decree reversed.*