## BUTTIMER v. DETROIT SULPHITE TRANSP. CO. et al. (NELSON et al. Intervening Libelants).

### No. 15667.

District Court, E. D. Michigan, S. D.
June 17, 1941.

223

Thomas J. Rafferty, of Detroit, Mich., for libelants and intervening libelants.

Hill, Hamblen, Essery & Lewis, of Detroit, Mich., for respondents.

TUTTLE, District Judge.

This is a libel brought by seamen to recover extra wages claimed to be owed libelants by respondents.

It is alleged in the libel that in the navigation seasons of 1937 and 1938 respondents employed libelants, some just in 1937, others just in 1938, and others during both seasons, at agreed monthly wages, to serve as members of the crews of the barges Cordova, Sidney G. Thomas, and Mitsch-

fibre; that the barges were operated by respondents in the transportation of pulp wood from Canadian ports on Lake Superior to Detroit, Michigan; that each and every voyage made by the barges covered more than six hundred miles; and that in violation of the provisions of 46 U.S.C.A. § 673, respondents required libelants "to stand watches which totaled twelve hours each and every day", while so employed.

The provisions of Section 673, on which libelants rely and under which they assert the right to recover extra wages, are as follows:

"In all merchant vessels of the United States of more than one hundred tons gross, excepting those navigating rivers, harbors, lakes (other than Great Lakes), bays, sounds, bayous, and canals, exclusively, the licensed officers and sailors, coal passers, firemen, oilers, and water tenders shall, while at sea, be divided into at least three watches, which shall be kept on duty successively for the performance of ordinary work incident to the sailing and management of the vessel. * * * The seamen shall not be shipped to work alternately in the fireroom and on deck, nor shall those shipped for deck duty be required to work in the fireroom, or vice versa; nor shall any licensed officer or seaman in the deck or engine department be required to work more than eight hours in one day; but these provisions shall not limit either the authority of the master or other officer or the obedience of the seamen when in the judgment of the master or other officer the whole or any part of the crew are needed for maneuvering, shifting berth, mooring, or unmooring, the vessel or the performance of work necessary for the safety of the vessel, her passengers, crew, and cargo, or for the saving of life aboard other vessels in jeopardy, or when in port or at sea, from requiring the whole or any part of the crew to participate in the performance of fire, lifeboat, or other drills. While such vessel is in a safe harbor no seaman shall be required to do any unnecessary work on Sundays or the following-named days: New Year's Day, the Fourth of July, Labor Day, Thanksgiving Day, and Christmas Day, but this shall not prevent the dispatch of a vessel on regular schedule or when ready to proceed on her voyage. And at all times while such vessel is in a safe harbor, eight hours, inclusive of the anchor watch, shall constitute a day's work. Whenever the master of any vessel shall fail to comply with this section and the regulation issued thereunder, the owner shall be liable to a penalty not to exceed $500, and the seamen shall be entitled to discharge from such vessel and to receive the wages earned. But this section shall not apply to vessels engaged in salvage operations: Provided, that in all tugs and barges subject to this section when engaged on a voyage of less than six hundred miles, the licensed officers and members of crews other than coal passers, firemen, oilers, and water tenders may, while at sea, be divided into not less than two watches, but nothing in this proviso shall be construed as repealing any part of section 222 of this title. This section shall take effect six months after June 25, 1936. As amended June 25, 1936, c. 816, § 2, 49 Stat.1934; June 23, 1938, c. 597, 52 Stat. 944."

Libelants contend that under the provisions of this section it was incumbent on respondents while at sea to divide the crew of each barge into three watches so that each man would stand watch but eight hours a day; and that, the crews while at sea having been divided into but two watches so that each man was required to stand watches which totaled twelve hours a day, each libelant is entitled to recover four hours' additional pay for each day while at sea that he was in the employ of respondents, together with the penalties provided by T. 46 U.S.C.A. § 596.

The answer admits that respondent Detroit Sulphite Transportation Company was the owner and operator of the barges at the times in question; that the barges were engaged in the carriage of pulp wood from Canadian Ports on Lake Superior to Detroit, Michigan; that libelants were employed by the transportation company on various of the barges at various times during the seasons of 1937 and 1938; and alleges that each of the libelants was employed at an agreed rate of pay and that each was paid his wages in full at the agreed rate on termination of his employment.

The answer denies the allegations of the libel in respect to the length of the voyages made by the barges and alleges that the barges carried at all times the full complement of crew required by law.

As to respondent Detroit Sulphite Pulp and Paper Company, the answer denies that it was engaged in operating the barges.

Respondents contend that all of the voyages on which the barges engaged were,

within the meaning of the statute, "voyage[s] of less than six hundred miles," and that in dividing the crews into two watches respondents were acting within the terms of the provision that "* * * in all tugs and barges subject to this section when engaged on a voyage of less than six hundred miles, the licensed officers and members of crews other than coal passers, firemen, oilers, and water tenders may, while at sea, be divided into not less than two watches, * * *".

Respondents contend further that the only remedy which the statute gives to seamen for a violation of the statute by an owner or by the master of a vessel is the right to receive their discharge and to receive wages earned; that it does not create a liability on the part of the owner for the payment of extra wages or overtime where seamen have stood watch for more than eight hours a day in violation of the statute, and that to allow a recovery of extra wages for such additional hours on watch would be to sanction a working arrangement the effect of which would be to defeat the purpose of the statute.

### Findings of Fact.

Respondent Transportation Company, a subsidiary of respondent Pulp and Paper Company, was the owner of the barges. It operated them in the carriage of pulp wood cargoes from Canadian ports on Lake Superior to the plant of its parent company at Detroit, Michigan; it hired the crews and paid them, and I find was libelants' employer.

The essential facts are, in the main, admitted by both parties.

It is not in dispute that the barges were not inspected vessels and were not required to carry licensed officers or certificated seamen or certificated firemen. In addition to a cook, each barge had a crew of eight, divided into two watches. One man was employed as master and one as mate. Libelant Frank Kunna, a mate, is the only one of those employed as master or as mate who is a party to this action. The other six were employed as plain sailors. The barges were without motive power of their own, the motive power having been furnished by a tug owned by respondent Transportation Company. On each barge two men, one on each watch, looked after a donkey boiler which furnished steam for running a generator, the steering engine, heating and any

other auxiliary purposes. None of them were required to have certificates as firemen issued by the Bureau of Marine Inspection and Navigation.

The movements of the barges were so planned that while one barge was at a Lake Superior port loading pulpwood, one was at Detroit unloading her cargo, and one was in transit in tow of the tug. About a week was required to load, about a week to unload, and about half a week for the trip up the Lakes and about half a week for the trip down. It is admitted that before the tug and barge departed from Detroit clearance had to be obtained from the United States Customs for the Canadian port of loading, and upon arrival in Canada that entry had to be made; and that before departing from the Canadian port of loading for Detroit clearance had to be obtained from the Canadian Customs for Detroit and that the tug and barge had to make entry and pass Immigration upon arriving at Detroit.

Libelants had no duties to perform in connection with loading and unloading cargoes. The loading was done by contractors and the unloading was done by employees of respondent Pulp and Paper Company. While in port, libelants' duties consisted of standing anchor watch and carrying on the usual ship's work; and the evidence shows, and I find, that they were not required, when in port, to work more than eight hours a day.

It is admitted that the distance from Detroit to each of the various Canadian ports on Lake Superior at which the barges loaded is less than six hundred nautical miles; and that the distance from Detroit to each of these ports is less than six hundred statute miles, except to Port Arthur. The distance from Detroit to Port Arthur is six hundred four statute miles. During the seasons in question but two cargoes were loaded at Port Arthur.

At the close of the navigation season each year in the fall, one barge was left at Port Arthur for the winter, the members of the crew being paid in Duluth on this occasion. Their fare from Port Arthur to Duluth and Duluth to Detroit was paid by respondent Detroit Sulphite Transportation Company. These were the only times the crews were paid at any port other than Detroit. At the opening of the navigation season the members of the crew of the barge left at Port Arthur were sent to

226

that port, their fare being paid by respondent, and on the arrival of the barge at Detroit on the first trip down the lake, the members of this crew received their first pay at Detroit. The practice of the Transportation Company in paying the barge crews at Detroit is readily understandable as the Transportation Company's office was at Detroit and each barge was at that port unloading cargo at intervals of approximately three weeks. In determining the amount a man was to receive on a particular pay day, his monthly rate of pay was divided by thirty and the daily rate thus obtained was multiplied by the number of days which had elapsed since the preceding pay day. It is admitted that each of the libelants received the full amount of wages called for on the basis of the agreed monthly rate. It was not until after libelants' employment had terminated that libelants made claim for the extra wages involved in this suit.

The principal questions are (1) What constitutes a voyage within the meaning of the proviso in Section 673, and (2) Does the proviso refer to six hundred nautical miles or to six hundred land or statute miles?

It is libelants' position on the first question that the voyages made by these barges consisted of round trips, that is, from Detroit to the Canadian port of loading and return to Detroit. If this contention is correct, then each such round trip voyage was far more than six hundred miles, whether computed in nautical miles or land miles. They base their position principally on the fact that the crews were paid at Detroit following a round trip. On the second question, libelants' position is that distances on the Great Lakes are measured by land or statute miles, and, therefore, that it is necessary, in applying the proviso to voyages made on the Great Lakes, to read the words "on a voyage of less than six hundred miles" as though meaning "on a voyage of less than six hundred statute miles".

Respondents' position on the first question is that each trip from Detroit to the port of loading was a voyage by itself within the meaning of the proviso, and that so was each trip from the port of loading to Detroit. On the second question, respondents urge that the distance "of less than six hundred miles" referred to in the proviso, contemplates six hundred nautical miles.

## Conclusions of Law.

■ The term "voyage" is subject to more than one definition. Its meaning varies with the connection in which it is used. Deslions v. La Compagnie Generale Transatlantique (La Bourgogne), 210 U.S. 95, 135, 28 S.Ct. 664, 52 L.Ed. 973. In the instant case, the meaning of the term is to be ascertained, not from the procedure followed by respondents in paying the crews of the barges, but by considering the context in which the term is used in Section 673 and the purpose which Congress sought to accomplish in enacting the section.

■ The purpose of this section and statute was settled by the decision in O'Hara v. Luckenbach S. S. Company, 269 U.S. 364, 46 S.Ct. 157, 158, 70 L.Ed. 313. In that case, it was held that the primary purpose of the Seamen's Act, 38 Stat. 1164, and of Section 673, 46 U.S.C.A., was to promote safety at sea; that Section 673 "fundamentally, is a measure of precaution against those perilous and often unexpected emergencies of the sea when only immediate and wakeful readiness for action may avert disaster * * *", and that "its effect as a regulator of working conditions is a matter of subordinate intent." It is clear that in enacting the proviso permitting the division of the officers and certain members of the crews of tugs and barges into two watches when "engaged on a voyage of less than six hundred miles," the thing Congress had in mind was not the regulating of working conditions, but the factor of safety at sea and that on voyages of less than six hundred miles, made by tugs and barges, Congress deemed the division of the officers and certain members of the crew into two instead of three watches would not militate against the safety factor.

■ Shortly after the passage of this Section, as amended, the Secretary of Commerce, in pursuance of authority granted to him, issued a Regulation to Collectors of Customs, United States Shipping Commissioners, and other persons concerned. Section 6 of this Regulation contained the following provision:

"Local inspectors will note that the three-watch system extends to all licensed officers and to the sailors, coal passers, firemen, oilers, and water tenders, and will be governed accordingly in fixing the complement of licensed officers and crew as authorized by Section 4463 R.S., as amended [46 U.S.C.A. § 222]. It does not, however,

apply to the licensed officers and crew of tugs and barges when engaged in voyages of less than six hundred miles except with regard to coal passers, firemen, oilers, and water tenders. A voyage of less than six hundred miles ·is construed as meaning the entire distance traversed in proceeding from the initial port of departure to the final port of destination, stops at intermediate ports while en route not being considered as breaking the continuity of the voyage. Where changes in outstanding certificates of inspection are necessary they may be made by indorsement."

The definition of a voyage of less than six hundred miles set forth in this Regulation, namely, " * * * the entire distance traversed in proceeding from the initial port of departure to the final port of destination, stops at intermediate ports while en route not being considered as breaking the continuity of the voyage.", although not controlling in this case, is persuasive and, in my opinion, sound.

In the instant case when one of the barges departed from Detroit, she cleared for the Canadian port at which she was to load; on arrival at the port of loading entry was made; and she remained in the port of loading, taking on cargo, for upwards of a week before she cleared with cargo on her voyage to Detroit. On arrival at Detroit, entry was made at the United States Customs; and she remained in Detroit, unloading cargo, for upwards of a week before clearing light for a Lake Superior port to again load cargo. To hold, under such circumstances, that the round trip constituted the voyage within the meaning of Section 673 would be to ignore the purpose for which it was enacted and would be a distortion of its language.

On the upbound trips, Detroit was the initial port of departure and the Canadian port of loading was the final port of destination contemplated by the Regulation and the statute; and on the downbound trips the Canadian port of loading was the initial port of departure and Detroit was the final port of destination. I hold, as a matter of law, that the trip from Detroit to the Canadian port of loading was a voyage within the meaning of the statute, and that the trip from the Canadian port to Detroit was a voyage within the meaning of the statute.

I now take up the second question. On the charts of the Great Lakes, it is true that distances are given in statute or land miles. The proviso in Section 673 is one which has general reference. It does not pertain just to the waters of the Great Lakes but to all waters everywhere (including the oceans) not specifically excepted from ·its terms. It is common knowledge that on the oceans, seas and coastal waters generally, distances are measured in nautical miles. And it is presumed, unless otherwise specified, that distances on water refer to nautical rather than land miles. Rockland, Mt. Desert & Sullivan Steamboat Co. v. Fessenden, 79 Me. 140, 8 A. 550, cited with approval in Lazell v. Boardman et al., 103 Me. 292, 69 A. 97, 13 Ann.Cas. 673. Had Congress intended, in enacting Section 673, as amended, that a voyage of less than six hundred miles was to be measured, when made on the oceans, seas and coastal waters, in nautical miles, but when made on the Great Lakes was to be measured in the shorter land or statute mile, it would have so provided in plain language. I hold, as a matter of law, that the "voyage of less than six hundred miles" referred to in the proviso is to be measured in nautical miles.

Certain exceptions to the two-watch system are made in the proviso, namely, coal passers, firemen, oilers, and water tenders. None of the plaintiffs fall within the exceptions. The work of the men on these barges who looked after the donkey boiler when steam was needed for auxiliary purposes had nothing in common with that of firemen in the firehold of a self-propelled vessel and had nothing to do with providing motive power for the barges. They were plain sailors and I find that the law did not require them to be divided into three watches.

I find, as a matter of law, that respondent Transportation Company was not required to divide the crews of the barges into three watches; that in dividing the crews into two watches respondent was acting in accordance with law; and that libelants are not entitled to recover the extra wages claimed in the libel.

The conclusions already reached make it unnecessary for the court to pass upon the other defenses urged by respondents.

A final decree may be entered in accordance with this opinion, dismissing the libel and the intervening libel as to both respondents. As both libels were filed without prepayment of costs, in conformity with the provisions of Title 28 U.S.C.A. § 837, the decree is not to carry costs.