The **FULLER BRUSH COMPANY**

v.

**UNITED STATES of America.**

**Civ. No. 9925.**

United States District Court
D. Connecticut.

June 20, 1966.

Ruling on Motion for Additional
Findings Aug. 17, 1966.

Henry L. Shepherd, John S. Murtha, Shepherd, Murtha & Merritt, John C. Yavis, Jr., Brandon J. Hickey, Hartford, Conn., for plaintiff.

Jon O. Newman, U. S. Atty., Hartford, Conn., Peter J. Ciano, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

This is a suit for refund of taxes and interest paid to the United States by the plaintiff in response to an assessment against it of retailers' excise tax deficiencies and interest for the first quarter of 1957, the fourth quarter of 1959, and all four quarters of 1961. The total assessment, made on November 16, 1962, for the entire period from the first quarter of 1957 through the fourth quarter of 1961 was $466,866.85. The government denies any obligation to refund the taxes paid and counterclaims for the amount of the assessment unpaid, plus interest.

Jurisdiction is based on 28 U.S.C. § 1346(a) (1).

The plaintiff, The Fuller Brush Company, (hereinafter "Fuller"), is a corporation incorporated under the laws of the State of Connecticut, having its principal place of business in the State of Connecticut. Fuller is a wholesaler of cosmetics, toilet preparations and household articles which are purchased from it by independent contractor-dealers, (hereinafter "dealers"), who sell such products at retail. During all times material to this action (1957 through 1961) there were approximately 6000 dealers selling Fuller products door-to-door throughout the United States.

The assessment is based on sales of only one article, Fuller's Lavender Spray Sachet, (hereinafter "LSS"), and its taxability is claimed under 26 U.S.C. § 4021 which imposes a retail excise tax on the sale of certain articles.

Before reaching the question whether LSS is a taxable article within the meaning of the statute, it is necessary first to consider whether Fuller is liable for the taxes on sales made by its dealers. With each of its 6000 dealers widely known and identified as a "Fuller Brush Man" it would not have seemed incongruous had the Commissioner of Internal Revenue relied upon the presumption of correctness of a determination by him that sales of Fuller's LSS made by them were sales by the defendant through agents. However, the government's claim is more modest. The legal relationship between Fuller and the actual sellers at retail is irrelevant. The government has stipulated with the plain-

tiff that, "since Fuller did not sell toilet preparations at retail, the dealers, who did sell at retail, would be liable for the excise tax and its payment over to the defendant." Fuller's liability, if any, to the defendant for the payment of any retailers' excise tax must be based on a waiver agreement it made with the government (JT Exhibit 1), otherwise plaintiff may not be held liable for the payment of such taxes in those years, 1957, 1958 and 1959. The meat of the agreement is all in the first sentence.[1]

Contending that the waiver agreement does not apply to sales by its dealers of LSS purchased from it, Fuller argues that, since its whole purpose in seeking permission to pay the tax for its dealers was generated in 1948 when it made an agreement with Daggett & Ramsdell, (hereinafter "D & R"), to act as its distributor for a rather broad line of cosmetics manufactured by that company, its waiver applies only to such products. Apart from the D & R products, the Fuller line of admitted toilet preparations purchased from others included only a hand lotion throughout the period and a bath oil which was sold only during the last quarter of 1959. All of the reasons which Fuller testified it had in mind [2] when it sought permission to pay the tax in behalf of its dealers apply with equal force to its distribution of all taxable items whether bought from D & R or others.

In arguing for such an overriding effect upon the waiver agreement with the government, Fuller also stresses the uniqueness to it of the provision it made with D & R committing Fuller to distribute the D & R products at fixed prices under fair trade agreements. Whatever may have caused Fuller to set in motion the wheels that led to the waiver agreement, nothing in the language of the waiver agreement remotely suggests that the dealers' sales of taxable articles at retail upon which the company agreed to pay the tax were limited in any way by the source of their manufacture. To the contrary, the agreement relates only to the next step in the linear sequence of distribution—sale by the dealer.

Fuller also resorts to the "fair trade" commitment with D & R to support its claim that the waiver agreement applies only to D & R products. Emphasizing its commitment to "fair trade" D & R products as constituting a special situation in its contracts with its dealers, which permitted them to fix their own prices on other Fuller items, the plaintiff reads the waiver agreement's permission to pay taxes on sales at "retail list prices *established* by the Company" (emphasis added) in the light of its dealers' contract and argues that, since Fuller did not establish retail prices for its dealers on regular Fuller items, it could not, under the terms of the permission and waiver, collect the tax from its dealers on such

---

1. "In consideration of being permitted to pay in its own name but on behalf of its independent contractor representatives, who sell at retail otherwise than from an established place of business, the tax liability (including applicable penalties) incurred by them under sections * 2402 [4021] of the Internal Revenue Code, as amended, upon their sales at retail of articles purchased from the Company for such resale and computed upon the bona fide retail list prices established by the Company for its independent contractor representatives, the Company hereby assumes such liability and waives all right to contest an assessment of, or to claim a refund or credit of, any such tax assessed against or paid by the Company with respect to such retail sales of such articles by its independent contractor representatives on and after July 7, 1948 on the sole ground that the Company is not the retailer liable for the payment of such tax.

"* Enter section 2400 (jewelry) or section 2402 (toilet preparations), or both, as the case may be."

2. These were variations upon a single theme: To relieve its dealers of the necessity of collecting, reporting and remitting the tax.

sales. This view of the waiver agreement in juxtaposition to its own internal methods of operation is too self-centered. It is clear that the only purpose in the waiver agreement of "established" list prices is so that the taxes may readily, in aid of administrative convenience, be "*computed* upon the bona fide retail list prices established by the Company." (Emphasis added). Certainly "fair-trading" agreements were not required in order to establish a *list* price for that purpose. The "suggested" list price for LSS in the Fuller Brush Magazine [3] was sufficient to satisfy the requirement of the waiver agreement.

Furthermore, there was never any misunderstanding about the need for a company method of establishing a price for the purpose of computing the tax, as distinguished from the price at which the article *must* be sold at retail. When Fuller's house counsel initiated the negotiations with the Treasury Department which led up to the waiver agreement, he wrote to it on November 12, 1947:

"In the administration of some of the state sales tax laws, the state tax departments have authorized us as wholesalers to make a report of the estimated retail sales made by the dealers to whom we wholesale our merchandise. We have only the wholesale prices. We obtain an estimated retail figure by marking up the wholesale figures fifty percent. We make a report and pay the sales tax to the state. We bill each retailer for the amount of the sales tax using the estimated retail price. In this manner, the state gets the sales tax promptly and with a minimum of effort. They get it whether or not the goods purchased by the retailer are sold.

"There is no such provision in the Federal Cosmetic Tax Act. However, substantially the same results could be obtained if the retailers gave us or our employee a power of attorney to file a cosmetic tax return on his behalf, and also to pay the tax. We would bill the retailer for the amount of the tax that we reported for and on his behalf and as his agent. Inasmuch as we do not know his retail prices we would have to use an arbitrary mark-up of fifty percent of the wholesale price in order to arrive at the retail price. Another way of approaching it would be for each dealer to advise us at the end of each month the total amount of his cosmetic retail sales and the total amount of the tax he collected and under a power of attorney from the retailer to us we could make out a cosmetic tax report and pay the tax for the retailer.[4]

"In this manner the Revenue Department would receive all of the cosmetic tax due it."

The Treasury's reply on December 29, 1947, included the following:

"The Bureau has also, in response to specific requests from various companies, approved payment by them on a waiver basis of tax in behalf of their independent contractor representatives who resell articles at retail, provided, in each case, the representatives sell the articles (1) at retail list prices established by the company and (2) from other than established places of business.

"If your company desires to adopt this procedure, it should first submit to this office a request for permission to do so, *stating that it will pay the tax only in behalf of independent contractor representatives who do not have established places of business, and that the articles will be resold at retail by such representatives at prices estab-*

---

3. The published price as of May 1957, for example, (JT Exhibit 2) was $1.55 per can. The dealers' order form (plaintiff's Exhibit 39) carries the same price.

4. This last alternative was not permissible because the dealers did not have established places of business.

*lished and furnished by the company.* The company should also execute and submit, in duplicate, a waiver in the form shown by the enclosed sample of its right to claim refund or credit of such tax, showing in the space provided the date such procedure will be adopted. The waiver should be submitted for consideration at least a month before it proposes to begin paying the tax as shown thereon, for the reason that it should not adopt the procedure until it has received written approval of the plan by this office." (Emphasis added.)

The company offered to establish list prices and its request for the waiver was conditioned upon its statement that it would establish list prices for the purpose of computing the tax. Fuller is liable for the tax on sales by its dealers of taxable articles purchased from the company for such resale.

### *Taxability of Sales of LSS*

■ One preliminary issue must be decided before reaching the merits. Each party contends that the burden of proof is on the other. I hold that both the duty of bringing forth evidence and the burden of persuasion is on the plaintiff. United States v. Prince, 348 F.2d 746, 748 (2d Cir. 1965); United States v. Lease, 346 F.2d 696 (2d Cir. 1965).

Probably the earliest popular use of an aerosol spray bomb for dispersing liquified preparations into the immediately surrounding atmosphere for the benefit of humans was the "DDT" bomb. The same method is now used to disperse many preparations. Among these are three marketed by the plaintiff in aerosol spray cans. One is a product called "Lilac Mint Fulmist" which is used to spray a pleasant fragrance into a room and is admittedly not taxable. Another is "Leading Lady Fragrant Mist" which is used to spray a fragrant smelling preparation on the body and is admittedly taxable. And, third, there is "Lavender Spray Sachet" which is used to spray a fragrant smelling preparation into bureau drawers, boudoirs and clothes closets. The question presented by this case is whether sales of LSS are taxable.

■ Inquiry begins with the language of the act and with the recognized principle that " 'the words of statutes * * * should be interpreted where possible in their ordinary, everyday senses.' Crane v. Commissioner [of Internal Revenue], 331 U.S. 1, 6 [67 S.Ct. 1047, 1051, 91 L.Ed. 1301]." Malat v. Riddell, 383 U.S. 569, 571, 86 S.Ct. 1030, 1032, 16 L. Ed.2d 102 (1966). The Internal Revenue Code of 1954, 26 U.S.C. § 4021, reads:

"There is hereby imposed upon the following articles sold at retail a tax equivalent to 10 percent of the price for which so sold—

| | |
|---|---|
| Perfume. | Pomades. |
| Essences. | Hair dressings. |
| Extracts. | Hair restoratives. |
| Toilet waters. | Hair dyes. |
| Cosmetics. | Aromatic cachous. |
| Petroleum jellies. | Toilet powders. |
| Hair oils. | |

Any other similar substance, article, or preparation, by whatsoever name known or distinguished; any of the above which are used or applied or intended to be used or applied for toilet purposes."

There is no way to avoid some ambiguity in language and, in spite of appearances, the language in this tax statute is not an exception. Since the government does not maintain that LSS falls within one of the classes of listed substances, its sale

is taxable if it meets two tests: (1) It must be similar to one of the 13 classes of products; and (2) As is true of any of the enumerated substances, it must be used or intended for use for toilet purposes.

In addition to the statute, the frame of reference for the questions in this case also includes a Treasury Regulation issued by the men who have been put in charge of administering the tax laws.[5] Counsel for the government calls attention particularly to the following portion of it: "The tax attaches to the sale by the retailer of any preparation * * * used * * * for toilet purposes or used in connection with the bath or care of the body, or *applied to the clothing as a perfume* or to the body as a toilet article." (Emphasis added.)

### The Ingredients

The clear direction in the statute that any enumerated or similar preparation must be used for toilet purposes emphasizes a discrimination between what a preparation is and what it is used for.

That LSS contains some perfume oil is not denied. The chemical formula for LSS is:

| | |
|---|---|
| Perfume | 2.0% |
| Isopropyl Myristate | 1.0% |
| Dipropylene Glycol | 0.5% |
| Freon 11 | 57.9% |
| Freon 12 | 38.6% |

Dipropylene Glycol and Isopropyl Myristate are the carriers for the perfume. Freon 11 and Freon 12 are the propellants. The temperature of the spray at the nozzle of a fully charged container of LSS is minus twenty degrees farenheit. There is nothing contained in the formula of LSS which is harmful or toxic to the body, but since the spray at the nozzle is minus twenty degrees farenheit, the product does contain a warning that the product should not be sprayed on the skin. Prolonged use together with close proximity to the skin may cause frostbite. Plaintiff also sells a product called Lilac Mint Fulmist, which is admittedly a room deodorizer, and Leading Lady Fragrant Mist, an admitted cosmetic. Their chemical formulations are as follows:

| Lilac Mint Fulmist | | Leading Lady Fragrant Mist | |
|---|---|---|---|
| Perfume | 0.5% | Perfume | 1.2% |
| Dipropylene Glycol | 5.0% | Ethyl Alcohol | 60.8% |
| Isopropyl Myristate | 0.5% | Freon 12 | 3.8% |
| Freon 11 | 47.735% | Freon 14 | 34.2% |
| Freon 12 | 46.265% | | |

5.  Regulation 51, Section 320.50 (1941): "Scope of tax.—(a) The tax attaches to the sale by the retailer of the articles enumerated in section 2402 [4021] and similar articles commonly or commercially known as toilet articles, which are used or applied, or intended to be used or applied, for toilet purposes. Any article advertised or held out for toilet purposes, or for any purpose for which the articles enumerated in the law are customarily used, will be subject to the tax regardless of the name by which it may be known or distinguished. The tax attaches to the sale by the retailer of any preparation which is used or applied or intended to be used or applied for toilet purposes or used in connection with the bath or care of the body, or applied to the clothing as a perfume or to the body as a toilet article. The fact that any particular product, preparation, or substance coming within the scope of this law may have, or be held out to have, a medicinal, stimulating, remedial, or curative value does not exempt it from the tax, if it is used, or held out for use, as an adjunct to the toilet or for toilet purposes."

Revenue Ruling 58-38, 1958-1 Cum.Bull. 376 has been called to my attention. However, such a ruling, as distinguished from a regulation promulgated by the Secretary of the Treasury, is of little use as an aid in interpreting a tax statute. Biddle v. Commissioner of Internal Revenue, 302 U.S. 573, 582, 58 S.Ct. 379, 82 L.Ed. 431 (1938).

However, a comparison of one formula with another is not particularly enlightening on the question of use. While the pure perfume oil in Leading Lady Fragrant Mist is only 1.2% as compared to 2% of lavender oil in LSS, its transfer potential is extended fifty-fold by putting it into solution with a solvent or wetting agent as a carrier. It can all be sprayed onto the body, where the alcohol quickly evaporates leaving the perfume. There is very little solvent in LSS.

The 96.5% freon in LSS as compared to 38% freon in Leading Lady Fragrant Mist explains the label's explicit warning that LSS should not be sprayed on the body. In one sphere at least, a limitation on its use is clear—it was not intended to be applied directly to the body. If purposes for which it would be used are pre-occupying, some attention ought to be paid to its suitability for such purposes. LSS was not suitable for use as a preparation to be applied to the body.

### LSS is Applied to Clothing

Mr. Francis Smith, Director of Merchandising for Fuller and a participant in the introduction of LSS, stated that the product was designed to "deodorize confined areas" such as closets, boudoirs, bureau drawers and that Fuller was trying to keep step with the expanding aerosal bomb, room spray market. For this purpose, a so-called "dry spray" was developed; a spray that would suspend a fragrance in the air with a minimum of "fall-out" onto objects such as clothes. To insure this suspension, the consumer was directed to hold the product 20″ away from objects so that the stream of spray would disperse before it reached the clothes, the walls, etc. Mr. Abraham Weiner, a pioneer in aerosol packaging, and Mr. Donald B. Peck, a Fuller chemist, concurred in Smith's statement that the formula of the product would avoid and was devised to avoid "undesirable wetting." They also stated that the solution was so completely suspended that it would not wet out onto surfaces. However, they all agreed that some precipitation would occur, but said that it was unavoidable. The witnesses assured the court in response to a specific query on the point that the deposited odor would leave the clothing almost immediately, that it was only a "fugitive" scent. To sum up, they claimed that the product was put in the air to give a fresh smell to a confined area, that the smell was unavoidably imparted to the clothes if in the area, but that it would disappear soon after reintroduction to fresh air. In short, it was meant to keep fresh clothes fresh by keeping the areas in which they are stored free of musty and unpleasant odors.

This view of the product's use is somewhat at variance with the testimony of professional cosmetic consultants and Fuller's own advertising. Mrs. Katherine Torrey, an independent cosmetic consultant, stated that the product removed musty odors from clothes, that it freshened clothes. To paraphrase her testimony, LSS is intended to have a direct effect on clothes rather than the more incidental effect caused by their being placed in a clean smelling rather than a foul smelling environment. The discrepancy between the testimony of the company's personnel and their original concept is indicated by the advertising that a desired use for the product is that it will be applied to clothes. The brochures that are distributed to the prospective purchaser state that "Lavender Spray Sachet scents at a touch your lovely things with a lilting lavender fragrance." (JT Exhibit 4). These brochures are left with the customer for a few days before the Fuller Brush Man comes around and provides a main source of information about the product. (Testimony of Renaud J. Albert, independent dealer.) LSS is exhibited on a page with spot removers, clothes brushes and other clothing care articles. This presentation continued up to July 1960 when the product was put on a page with room sprays and demarked "a completely refreshing, clean and true lavender fragrance to freshen clothes and linen closets, bureau drawers and other confined areas." (JT Exhibit 17.)

The other source of information for the consumer about the Fuller product is the dealer himself; and his main source is the Fuller Brush Catalog, a looseleaf book frequently supplemented as a new product comes out. The earliest catalog in evidence, 1960, (plaintiff's Exhibit 20), describes LSS as "a fresh, clean, fragrant aerosol spray for use in closets and bureau drawers and other confined areas; for general use in the boudoir." However, the Fuller product manual of 1958, (plaintiff's Exhibit 18), another information source for the dealer, notes that the product "scent[s] lingerie and dainty underthings," although putting LSS in the category of "Chemical deodorizers." A product bulletin dated March 1957, (JT Exhibit 27), issued to supplement the product list, is highlighted by the description "new—a gentle fragrance that clings to all your lovely things" and a later bulletin, March 1958, (JT Exhibit 28), mentions its use "on clothes."

The can of LSS itself, which is reproduced in the catalog and the product manual, says in a prominent way: "JUST A TOUCH * * * Scents your lovely things." The back of the can, not seen in the advertising, tells the buyer to "use it always for closets, bureau drawers, linens, lingerie, and all your lovely things."

The inescapable impact of the advertising is to tell the consumer that this product will affect one's clothes, that it will scent them, and not merely that they will smell better because the closet smells better. Fuller has tried to explain away this conclusion by stating that the advertising was meant only to turn a disadvantage in the product, the fall-out, into an advantage. Whether or not this is true, the product is held out as something to scent clothes as well as areas.

I would conclude, on the basis of the advertising and, to a lesser extent, the testimony of Mrs. Bradley, that the product in issue, LSS, was intended to be applied and was applied to clothes, although in the subtle fashion of infusing the air with the product and having a portion of it precipitate out. Even Fuller's own main witness, Mr. Smith, recognized that this would occur and that Fuller decided to accent this characteristic positively rather than have it serve as a drawback to sales. Even though its use to scent clothes was concomitant with its function as a closet deodorizer, this former use was certainly not so insignificant or trivial that it must be regarded as a mere incidental use. Mione Mfg. Co. v. United States, 114 F.2d 647 (3d Cir. 1940); Sharp & Dohme, Inc. v. Ladner, 82 F.2d 733 (3d Cir. 1936).

### The Purpose of Applying LSS to Clothing

I find from the evidence that LSS's ultimate function is to negate or mask unpleasant odors on clothing, principally undergarments, and possibly to substitute a very mild yet affirmative scent of lavender. So used, it will not make the person who wears these slightly scented articles convey the aroma of lavender.

Mrs. Katherine Torrey stated that the product freshened clothes, that it removed musty odors. The testimony of Miss Neva Bradley was to the same effect —that LSS masks unpleasant smells without imparting a positive scent. Mr. Donald B. Peck, Fuller's Chief Chemist and a participant in the development of the product in issue, also told the court that LSS had the effect of masking but without creating an odor more than barely discernible to the wearer.

To confirm the proposition that LSS would not be saleable if it imparted any noticeable scent to the wearer, Mrs. Torrey and Miss Bradley noted that lavender is not a normal fragrance for the modern American woman, it's considered passé, old-fashioned, and associated with closet smells rather than with the delicate smell of perfumes for personal use. To quote Miss Bradley, "No modern woman would think of using it as a fragrance." Furthermore, no woman would want all her clothes to exude an affirmative, noticeable odor for it would interfere with her other fragrances.

The advertising presentation does not tell a different story. On the front of the can itself is conspicuously written "JUST A TOUCH . . . Scents your lovely things." The Fuller catalog, from September 1957—April 1960,[6] is to the same effect—"the fresh, fragrant aerosol spray for linens, lingerie and all your lovely things." Of note is the prefacing of the word "things" with the adjective "lovely." This indicates to me a tactful way of describing a use primarily if not exclusively on undergarments. Furthermore, the main fall-out will occur in the small areas such as a bureau drawer where such "lovely" things are kept rather than in more airy and less restricted closets where clothes are hung. Significantly, the ad is placed on the same page with a spot remover, clothes brushes and other clothing care articles. Taking this presentation in conjunction with the persuasive testimony of the "expert" cosmeticians concerning likely consumer reaction to the type of product, I am convinced that the product was intended to be used and is actually used to scent undergarments (as well as its use as a confined-area spray), but without the effect of conveying that scent to the wearer or her public.

The only evidence inconsistent with this conclusion is a reference in a March 1957 product bulletin [7] sent to dealers to inform them of the product's characteristics that *"you* and your lovely things smell exquisitely fresh and feminine-scented with the floral fragrance of lavender." (Emphasis added). But by March 1958, this assertion of a scent "on you" had disappeared. There is no reason forwarded by Fuller for the change, but one can guess that this error was corrected in order to avoid a false impression of the product's effect or because the company realized that such a quality would detract from the product's saleability. Even as to the wearer, the scent would survive for only a few moments after the clothes were put on. At the very least, the real and lasting merit was not dependent on its use as a scent "on you" for no commercially viable producer omits mention of a favorable selling point.

I conclude that LSS was not applied to clothing for the purpose of transmitting a positive scent to others.

### LSS is Not Applied to Clothing as Perfume

Returning now to the beginning, the applicable Treasury Regulation 51, Section 320.50 (1941), drawn as an exposition of § 4021 (formerly 2402) of the Internal Revenue Code which imposes a 10% retail excise tax on the sale of perfume or other enumerated preparations "any of * * * which are used or applied or intended to be used or applied for toilet purposes," states that "the tax attaches to the sale by the retailer of any preparation which is used or applied or intended to be used or applied for toilet purposes or used in connection with the bath or care of the body, or applied to the clothing as a perfume or to the body as a toilet article." Obviously, the ultimate criterion of taxability is use for "toilet purposes." When the regulation seeks to tax a product "applied to the clothing as a perfume," it is within the framework of a tax on articles for "toilet purposes."

The plaintiff maintains "as a matter of law that the regulations, in order to stand, must be subject to the toilet purpose test of the statute and that the toilet purpose test will be satisfied only if an article applied to the clothing as a perfume also is suitable for use on the person." The plaintiff claims too much.

The statutory phrase "used for * * * toilet purposes" means products used to enhance the attractiveness of the body itself to any sensory faculty, and almost exclusively concerns products applied to the body.

---

6. After that date, the presentation changed and emphasized the area deodorant feature of the product.

7. These product bulletins, because they only occasionally find their way into the hands of the ultimate consumer, have a de minimis function as a direct advertising device.

Section 4021 enumerates 13 classes of items all of which are intended to affect bodily appearance (broadly defined) (and, incidentally, are commonly applied directly to the body). Regulation 51, section 320.50(b) lists over 30 specific or general types of products as examples of products with a "toilet purpose" and taxable. All but sachets are directly applied to the body to produce the desired result; and sachets traditionally put a strong fragrance on clothes so that the effect of its use is not distinguishable from a fragrance applied directly to the body.

Peroxide Chemical Co. v. Sheehan, 108 F.2d 306, 308–309 (8th Cir. 1939), gives a definition that "[t]he nature of 'toilet purposes' contemplated by the Act is quite specifically indicated by its terms. Any preparation which is intended to affect, and, conceivably, to improve, the *bodily appearance* is included." (Emphasis added.) One thing is clear, and this distinction must be made: A product which is used to "affect, and, conceivably, to improve" the appearance of clothes is not taxable although a product accomplishing a comparable effect on the body would be taxable. There are examples of the discrimination in favor of the taxability of one and against the taxability of another class of uses. Soaps used to clean the body have a toilet purpose, while soaps used to clean clothes, "laundry soaps," do not. Fischbeck Soap Co. v. United States, 42 F.Supp. 287, 95 Ct.Cl. 582 (1942). Removers of stains from the body are taxable, while removers of stains from clothes apparently are not. Regulation 51, Section 320.50(b) (1941).

■ I can offer no distinguishing reason why items on clothes that appeal to the olfactory sense should be classified as having a toilet purpose while those appealing to the eye (cleaning products, shoe polish) or to the touch (fabric softener) are not.

"It is a well settled principle that laws are enacted, and hence must be interpreted, in the light of the commonly understood and accepted meaning of their language in the particular trade or business to which they are applicable. Willcuts v. Milton Dairy Co., 275 U.S. 215 [48 S.Ct. 71, 72 L.Ed. 247]; O'Hara v. Lukenbach S.S. Co., 269 U.S. 364 [46 S.Ct. 157, 70 L.Ed. 313]; Sonn v. Magone, 159 U.S. 417 [16 S.Ct. 67, 40 L.Ed. 203]; Maddock v. Magone, 152 U.S. 368 [14 S.Ct. 588, 38 L.Ed. 482]; Merten's Law of Federal Income Taxation, ¶3.15." New Hampshire Fire Ins. Co., 2 T.C. 708, 721 (1943), aff'd, New Hampshire Fire Ins. Co. v. C. I. R., 146 F.2d 697 (1st Cir. 1945). With this in mind and, since the phrase "toilet purpose" has certain inherent ambiguities, perhaps one can take into account definitions given at trial by those in the industry whose expertise lies in the study and analysis of consumer preference as making "ordinary, everyday sense."[8] Crane v. Commissioner of Internal Revenue, 331 U.S. 1, 6, 67 S.Ct. 1047 (1947). In so doing, I am aware of the admonition that an industry is not authorized to make a self-determination as to whether a preparation is taxable. Cf. Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966). Mrs. Torrey said that "a toilet preparation" is a product for "personal use for beautification or for comfort—to be used on the person," while Miss Bradley adamantly maintained that she had never heard of a toilet preparation that could not be used on the person.

---

8. The bulk of the testimony presented was relevant to whether the product would be used or was intended to be used for toilet purposes rather than whether it is actually so used and this despite the obvious fact that the amount of the assessment demonstrates that substantial amounts were sold to consumers. Thus, instead of historical facts, much of the testimony was in the form of opinion.

A poll prepared for the plaintiff probing the issue of how the public used LSS was given no weight by the court for the questions asked did not sufficiently define its terms and thus introduced uncertainties as to the meaning of the responses.

■■ Having fixed the definition of "toilet purposes" into a manageable concept, it becomes apparent that a product applied to clothes for the sole purpose of affecting their appearance in the broadly defined sense does not have a "toilet purpose." What then is the meaning of the regulation taxing a product "applied to the clothing as a perfume"? If it includes products that have no effect on bodily appearance, it goes beyond the meaning of "toilet purpose" and thus beyond the governing statute. But "in interpreting a Regulation the courts will ordinarily avoid a construction which raises doubts as to its validity." 1 Mertens, Law of Federal Income Taxation, § 3.21 citing Newman v. Commissioner of Internal Revenue, 76 F.2d 449 (5th Cir.), cert. denied, 296 U.S. 600, 56 S.Ct. 116, 80 L.Ed. 425 (1935); Long Poultry Farms, Inc. v. Commissioner of Internal Revenue, 249 F.2d 726 (4th Cir. 1957). As I see it, the regulation seeks to frustrate the attempts of manufacturers to design a product applied in an unusual fashion but accomplishing the same result as a normal toilet article—such as a sachet which, when properly used, will give the same end result as a perfume on the body; but unlike a product such as a laundry soap, whose function is to clean—but not to clean the body. The regulation taxing products "applied to the clothing as a perfume" is designed to meet this indirection; i. e., to tax a product that achieves, although put on the garment rather than the person, the identical effect as a fragrance put on the body—a delicate odor conveyed to others. In other words, a product cannot avoid the tax by attaining through indirect means the same result as an admittedly taxable product. So read, the regulation is valid.

It is not necessary to say that a preparation "applied to the clothing as a perfume" may never be used for toilet purposes. On the other side, neither can it be said that the quoted phrase must be read in isolation from the rest of the language in which it is couched and be divorced from the purpose of the statute to impose a tax only on the sale of preparations "which are used * * * for toilet purposes" so as to permit the pursuit of taxes beyond the bounds of the statute. The court and the Treasury " * * * are not at liberty * * * to add to or alter the words employed to effect a purpose which does not appear on the face of the statute." Hanover Bank v. Commissioner of Internal Revenue, 369 U.S. 672, 687, 82 S.Ct. 1080, 1089, 8 L. Ed.2d 187 (1962).

LSS is not used or intended to be used nor is advertised for use as a product which will impart onto clothes a scent noticeable to the wearer or those around her and thus does not simulate the effect of a perfume applied to the body. It is not "applied to the clothing as a perfume" and is thus not taxable.

■■ I conclude that the Fuller product is not taxable under Section 4021, Internal Revenue Code of 1954.

This opinion constitutes the court's findings of fact and conclusions of law.

On December 31, 1962, the plaintiff paid the assessment for the fourth quarter of 1959 and the four quarters of 1961, and interest thereon in the amount of $77,661.93; and on April 20, 1964, it paid the assessment for the first quarter of 1957 and interest thereon in the amount of $2,382.62. It is entitled to recover these amounts plus interest thereon from the dates of payments. These amount respectively to $93,838.91 and $2,692.41.

Enter judgment for the plaintiff on the complaint to recover of the defendant $96,531.32 and for the plaintiff on the defendant's counterclaim.

### RULING ON MOTION FOR ADDITIONAL FINDINGS AND CONCLUSIONS OF LAW

The motion for additional findings and conclusions of law is denied. The court's findings and conclusions are fully stated in the Memorandum of Decision.