In the Matter of ERIE LACKAWANNA
RAILWAY COMPANY, Debtor.

Appeal of CONSOLIDATED RAIL
CORPORATION, and United
States Railway Association.

No. 76–1569.

United States Court of Appeals,
Sixth Circuit.

Argued June 7, 1977.

Decided Sept. 20, 1977.

John G. Harkins, Jr., Laurence Z. Shiekman, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Charles J. Bloom, Edwin Rector, Howard M. Wilchins, Cary W. Dickieson, U. S. Ry. Ass'n, William P. Kennedy, Washington, D. C., for appellants.

Richard Jackson, Erie Lackawanna Ry. Co., Cleveland, Ohio, Harry G. Silleck, Jr., New York City, for appellee.

Carl C. Tucker, Frank C. Heath, William S. Paddock, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for Morgan Guaranty & Cleveland Trust Co.

Malvin E. Bank, Alan R. Lepene, Thompson, Hine & Flory, Cleveland, Ohio, for First Nat. City Bank & U. S. Trust Co. of N. Y.

Ralph A. Colbert, Squire, Sanders & Dempsey, Cleveland, Ohio, for Manufacturers Hanover Trust & Marine Midland Bank —N. Y.

Before WEICK, LIVELY and ENGEL, Circuit Judges.

WEICK, Circuit Judge.

Consolidated Rail Corporation (Conrail) and the United States Railway Association (USRA) have appealed from Order No. 506 of the United States District Court for the Northern District of Ohio, the Honorable Robert B. Krupansky presiding (Reorganization Court), which order, *inter alia*, made determinations on five separate questions which arose in the course of proceedings under § 211(h) of the Regional Rail Reorganization Act of 1973 (Rail Act) as amended, 45 U.S.C. § 721(h).[1]

As this Court noted in *In Re Erie Lackawanna Ry., Debtor, Appeal of Conrail*, 558

1. For an explanation of § 211(h) *see In Re Erie Lackawanna Ry., Debtor, Appeal of Conrail*, 558 F.2d 339, No. 76–2417 (6th Cir. 1977) and *In re Erie Lackawanna Ry., Debtor, Appeal of Non-Contract Retirees*, 548 F.2d 621 (6th Cir. 1977).

F.2d 339, at 341 No. 76–2417 (6th Cir. 1977), § 211(h)(3) of the Rail Act—

authorizes USRA to petition the Reorganization Court for an order (consistent with § 77 of the Bankruptcy Act, 11 U.S.C. § 205, and with the § 211(h)(2) agency agreement) to be entered prior to conveyance identifying and applying "cash and other current assets" of the debtor estate, which cash and assets are to be made available in the post-conveyance period for the payment of the pre-conveyance obligations identified in [§ 211(h)(1)].

On February 20, 1976 USRA, acting pursuant to § 211(h)(3), filed a petition with the Reorganization Court "FOR ORDER FOR IDENTIFICATION OF CASH AND OTHER CURRENT ASSETS AND FOR APPLICATION OF SUCH ASSETS TO PAYMENT OF CERTAIN OBLIGATIONS OF THE ESTATE." The various parties in interest, i. e., USRA, Conrail, the Committee of Interline Railroads, the EL Trustees, and the trustees under various mortgage indentures securing bonds issued or assumed by EL, i. e., Citibank, N.A., et al., (Indenture Trustees), filed statements of position on the questions raised by USRA's petition.

A hearing on USRA's petition was held on March 22, 1976. Shortly thereafter, on March 31, 1976, the Reorganization Court issued Order No. 506, the subject of this appeal.

Specifically, the Reorganization Court held that certain escrowed funds in question could not be made available for application as "cash and other current assets" under § 211(h)(3); that the Erie Lackawanna (EL) estate's liability for vacation pay earned pre-conveyance by certain of its employees ceased as of the date of the conveyance of EL's assets to Conrail (April 1, 1976) and that this vacation pay then became the obligation of Conrail; that Conrail as agent of the EL estate must use the "cash and other current assets" identified pursuant to § 211(h)(3) first to pay non-§ 211(h)(1) claims and only thereafter to apply the funds to claims identified in

§ 211(h)(1); that no obligation of EL exists on or after the date of conveyance for the principal of obligations, or for the interest which has accrued thereon post-conveyance, in respect of railroad rolling stock; and that Conrail is liable for inventories received by the EL estate prior to conveyance but not paid for at the time of conveyance.

We affirm as to the Reorganization Court's determination that the escrowed funds in question are not "cash and other current assets" within the meaning of § 211(h)(3) of the Act. With respect to the railroad rolling stock and inventory issues, we reverse for lack of subject matter jurisdiction; and with respect to the Reorganization Court's determination that "cash and other current assets" must be used first to pay non-§ 211(h)(1) claims, we reverse in light of the October 1976 amendments of the Rail Transportation Improvement Act (RTIA). The vacation pay issue is currently the subject of settlement discussions among the parties and therefore we do not address that issue at this time.

I

In Order No. 506 the Reorganization Court held that the escrowed funds carried on the EL estate's books primarily under Special Account No. 716, "Capital and Other Reserve Funds," in accordance with the Interstate Commerce Commission's (ICC) Uniform System of Accounts for Railroad Companies, are—

specifically excluded from any Section 211(h)(3)(A) designation as not being "current assets" within the contemplation of the Act and these funds are reserved for the purposes for which they have been specially deposited.

These escrowed funds represent pre-bankruptcy and post-bankruptcy sales of mortgaged property in an estimated aggregate amount of $4,152,189.39 as of the date of conveyance, April 1, 1976.

We are of the opinion that the Reorganization Court properly determined that the escrowed funds in question should not be identified and applied as "cash and other current assets" within the meaning of § 211(h)(3) of the Act.

First, in the absence of any guidance in the Rail Act or in the legislative history as to the meaning of "cash and other current assets," we ascribe that meaning which accords with generally-accepted accounting principles for the railroad industry. *See generally O'Hara v. Luckenbach S.S. Co.,* 269 U.S. 364, 370–71, 46 S.Ct. 157, 70 L.Ed. 313 (1926). The formal designation on the EL estate's books given to the escrowed funds in question was "Capital and Other Reserve Funds" in conformity with the required accounting classifications prescribed by the ICC. We are of the opinion that funds formally designated as "capital" assets pursuant to the ICC system of accounts cannot be conveniently identified as "current" assets for the purpose of payment of administration claims. Indeed, as Judge Fullam of the Penn Central Reorganization Court stated in *In Re Penn Cent. Transp. Co.,* 411 F.Supp. 1079, 1085 (E.D.Pa. 1976):

> I fail to see how escrow accounts which are either deposited pending resolution of disputes as to ownership and entitlement thereto, or subject to liens, or both, can reasonably be deemed "cash and other current assets" of the Debtor's estate within the meaning of § 211(h)(3). . .

> The short answer to USRA's contentions is that, to the extent the Trustees have a present interest in the escrow funds reflected in the ICC account No. 716, these are capital assets, not current assets.

Furthermore, although Judge Pratt of the Ann Arbor Reorganization Court ultimately determined that liened escrowed funds comprising the Ann Arbor estate's ICC Account No. 716 were "cash and other current assets," even he conceded that there were "a number of counterveiling [sic] considerations." Judge Pratt stated in *In Re Ann Arbor R.R.,* 414 F.Supp. 812, 824 (E.D.Mich. 1976):

> Foremost among those [countervailing] considerations is the force of the strict legislative intent approach. In selecting the phrase "cash and current assets," Congress utilized a term with a pre-existing and conventional meaning. More-

over, the failure to define the term and the patent lack of consideration of its import provide a basis for arguing that the term is limited to its technical definition. [footnote omitted]

We are unable to discern any legislative intent to alter the established ICC accounting classifications for the purpose of identifying "cash and other current assets" within the meaning of § 211(h)(3) and accordingly, we conclude that the escrowed funds in question remain "capital" and not "current" assets for the purposes of § 211(h)(3) of the Act.

Second, as already noted, § 211(h)(3)(B) provides that the application of the identified "cash and other current assets" must be "consistent with the principles of reorganization under section 205 of Title 11 [§ 77 of the Bankruptcy Act] . . . ." As did the parties in *In Re Penn Cent. Transp. Co.,* supra at 1084–85, the parties in the present case have devoted much of their arguments to the question of the applicability to the present case of the bankruptcy principles enunciated in *In Re Penn Cent. Transp. Co.* [*Columbus Option* case], 494 F.2d 270 (3d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 147, 42 L.Ed.2d 122 (1974), and in several other similar cases. The *Columbus Option* Court held that proceeds of the sale of unmortgaged capital assets of Penn Central Transportation Co., Debtor, could not be expended for general operations of the debtor. The Court, at 275, endorsed the test set forth in *In Re Third Ave. Transit Corp.,* 198 F.2d 703, 706–07 (2d Cir. 1952), for "the use of proceeds held by the indenture trustee from the sale of mortgaged assets" in subsidizing the debtor's operations. The test consists of three requisites for the invasion of proceeds of such mortgaged assets:

(1) "that it is imperative to obtain the funds and that they cannot be obtained" from other sources;

(2) "that the secured creditors . . . will not be injured"; and

(3) "that there is a high degree of likelihood . . . that the debtor can be reorganized . . . within a reasonable time."

Assuming, arguendo, that the escrowed funds in question somehow could be characterized and identified as "cash and other current assets" on the EL estate's books (a proposition with which we do not agree), USRA and Conrail have not demonstrated that application of the escrow funds under § 211(h)(3) would be "consistent with the principles of reorganization" under § 77 of the Bankruptcy Act. It is clear that at least the first two requisites of the above test have not been satisfied.

With respect to the first requisite, we are of the opinion that it is not "imperative" to invade the liened escrowed funds because § 211(h)(1) allocates loan moneys to rectify the shortfall between the "cash and other current assets" of the estates and the accounts payable of the estates. While § 211(h)(1) originally authorized USRA to make loans not to exceed $230 million in the aggregate through Conrail to the estates for the payment of certain pre-conveyance obligations, the October 1976 amendments of RTIA[2] increased the total amount of available loan funds from $230 million to $350 million. As the House Conference Committee Report, H.R.Rep. No. 94–1743, 94th Cong., 2d Sess. 33–34 (1976), explained, this latter sum "establishes what is in effect a revolving fund from which additional loans can be made as the initial total amount of loans is reduced by projected revenues or assets becoming available to the estates for this purpose." The Conference Committee Report further stated at 34:

> It is the Conference Committee's hope that the total funds authorized by this new bill, would be sufficient to retire all claims as they are finally ascertained as to amount. If this is not the case, we would immediately seek additional Congressional authorization to provide the funds necessary to ensure the full payment of all obligations in a timely manner. (*Reprinted in* [1976] U.S.Code Cong. & Admin.News p. 5857.)

Thus it seems clear that it is not "imperative" that the liened escrowed funds be used now to pay the § 211(h)(1) pre-conveyance obligations because such obligations can be paid from other sources, *i. e.,* identified "cash and other current assets" supplemented by a substantial revolving loan fund.

Conrail and USRA contend that all of the § 211(h)(1) pre-conveyance obligations constitute administration claims which must be paid before secured or unsecured creditors, and they apparently argue that therefore, the escrowed funds in any event will eventually be used in payment of administration claims. We cannot assume, however, that all or even a portion of the escrowed funds will necessarily be used to pay administration claims, particularly those identified under § 211(h)(1); and should such funds be used for such purposes, the funds will remain subject to the right (albeit an uncertain one, *see infra*) of the Indenture Trustees for compensation for erosion.

With respect to the second requisite for invading escrowed funds, we are of the opinion that the secured creditors, or bondholders holding liens against the escrowed funds, will be prejudiced by the application of such escrowed funds to the payment of § 211(h)(1) pre-conveyance obligations. Clearly, the bondholders' liens are already in a subordinate position with respect to administration claims, and as we noted in *In Re Erie Lackawanna Ry., Debtor, Appeal of United States,* 558 F.2d 1262 at 1264 (6th Cir. 1977), "[t]here seems to be a real question whether bondholders will receive anything from the estate." Therefore, the bondholders' security should not be im-

---

2. It should be noted that the October 1976 amendments of RTIA did not deal with the question of whether escrowed funds are "cash and other current assets." The House Conference Committee Report, H.R.Rep. No. 94–1743, 94th Cong., 2d Sess. (1976), stated at 35:

A problem also exists as to whether or not escrowed funds are "cash or other current assets" as provided in existing legislation. The matter is presently on appeal in several Circuit Courts. The Committee has no intention of interfering with this case.
(*Reprinted in* [1976] U.S.Code Cong. & Admin.News p. 5858.)

paired more than is absolutely necessary. As to the availability of a Tucker Act remedy for secured creditors for erosion of assets, we note the late Judge Hastie's observation that the "long delays and practical uncertainties about recoupment" may be unavoidable in seeking such a remedy. As Judge Hastie stated in *In Re Penn Cent. Transp. Co.*, 533 F.2d 1347, 1352 (3d Cir. 1976):

The section 77 trustees and the reorganization court have not been relieved of their responsibility to consider and deal equitably with all claimants who have an interest in the Penn Central estate. True, the Supreme Court has determined that Penn Central creditors have an ultimate remedy under the Tucker Act for erosion losses the government has forced upon the bankrupt estate. *Regional Rail Reorganization Act Cases*, 1974, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320. And the Court deemed that remedy constitutionally adequate. But the legitimate interests of Penn Central creditors are fairly and more fully served by additional measures calculated to prevent or minimize erosion losses and thus to avoid the long delays and practical uncertainties about recoupment that unavoidably will attend resort to a Tucker Act remedy.

Thus it is clear that under the bankruptcy principles set forth in the *Columbus Option* case, the escrowed funds in question may not be applied to the payment of the § 211(h)(1) obligations.

Finally, it should be noted that the parties conceded in the proceedings below that § 211(h)(3)(A) does not require *all* "cash and other current assets" to be applied to the payment of § 211(h)(1) claims. In fact, the present language of § 211(h)(3)(A), contrary to earlier legislative versions which included the word "all,"[3] expressly requires the Reorganization Court to identify only "*that* cash and other current assets . . . . which shall be utilized to satisfy obligations of the estates identified in § 211(h)(1)." [emphasis added]

Thus, again assuming arguendo, that the liened escrowed funds in question could somehow be characterized as "current assets" on the EL estate's books, this language in § 211(h)(3)(A) makes it clear that the Reorganization Court has discretion in determining which "cash and other current assets" will be identified pursuant to the statute. Likewise as already noted, § 77 bankruptcy principles give the Reorganization Court equitable discretion in determining whether certain "cash and other current assets" will be applied pursuant to the statute.

■ We are of the opinion that the Reorganization Court's determination that the escrowed funds in question should be neither identified nor applied as "cash and other current assets" pursuant to § 211(h)(3), was not an abuse of discretion and was in no sense arbitrary or unreasonable.

## II

The Reorganization Court ordered implementation of a provision in Paragraph 5(a) of the Conrail/Erie Agency Agreement which required that the "cash and other current assets" identified pursuant to § 211(h)(3) be utilized first to pay the accounts payable not enumerated in § 211(h)(1) and thereafter, funds remaining be utilized to pay the pre-conveyance obligations eligible for payment with loan funds pursuant to § 211(h)(1). In oral argument counsel for Conrail represented that its appeal with respect to this issue was no longer necessary by reason of certain clarifying language in § 203(b) of the October 1976 amendments of RTIA which effectively reverses the Reorganization Court's order to the extent it implements Paragraph 5(a) of the Agency Agreement. We agree.

Specifically, § 203(b)(1) of RTIA amended § 211(h)(2) of the Rail Act, 45 U.S.C. § 721(h)(2), to provide that the accounts receivable and other estate assets processed by Conrail pursuant to the Agency Agreement be used—

---

3. *See* H.R.Rep. No. 94–725, 94th Cong., 1st Sess. 41 (1975).

for the payment of only those accounts payable which relate to the obligations of the estates identified in paragraph (1) of this subsection.

Section 203(b)(2) of RTIA further amended § 211(h)(2) of the Rail Act by prohibiting the Reorganization Courts' enjoining, restraining, or limiting Conrail's applying any "cash or other current assets" toward payment of § 211(h)(1) obligations.

Section 203 of RTIA was explained in the House Conference Committee Report, H.R. Rep. No. 94–1743, 94th Cong., 2d Sess. 34–35 (1976) as follows:

> With regard to the inability to pay some of the claims at the present time with available funds, the Conference Committee is aware that some confusion exists regarding the Congressional intent as to the application of the assets of the estates to 211 claims. It was the Congressional intent that the loan funds were to be used in conjunction with the assets of the estates to meet 211 claims, and not in lieu of the assets of the estates.
>
> Several of the reorganization courts, however, have made a different interpretation of the act. The courts have been reluctant to use assets of the estate, except current accounts receivable, to pay these claims. In addition, the court has been unclear as to what specific claims could be paid with 211(h) funds. In some cases, unfortunately, the courts have held that available estate funds should be applied to the payment of obligations which are not eligible for 211(h) funding. The end result of these interpretations prevents USRA from releasing any funds to ConRail and the other acquiring carriers to pay these claims. We have, therefore, amended 211(h)(2) to make our original intent clear.

(*Reprinted in* [1976] U.S.Code Cong. & Admin.News pp. 5857–58)

We must add, however, that § 203(b)(2) of RTIA also provided a limiting prospective effect of the amendment, as follows:

> Nothing in this paragraph [§ 211(h)(2)] shall be construed to affect any payment made prior to such date of enactment

[October 19, 1976] with respect to obligations other than those identified in paragraph (1) of this subsection.

■ Thus it is clear from the statutory language of § 211(h)(2) as amended and from the legislative history of RTIA, that the "cash and other current assets" identified pursuant to § 211(h)(3), after the enactment of the October 1976 amendments of RTIA, must be utilized first in payment of the pre-conveyance obligations enumerated in § 211(h)(1).

### III

The Reorganization Court ruled in Paragraph 8 of its Order as follows:

> No obligation of EL within the meaning of Section 303(b)(3) of RRRA exists on and after the date of conveyance for the principal of obligations in respect of railroad rolling stock and no obligation of EL for the interest on such obligations exists on and after the date of conveyance except as provided in said Section.

The "exception" language in § 303(b)(3)(A)(i) of the Rail Act as amended, 45 U.S.C. § 743(b)(3)(A)(i), provided in part that the "assignor" (EL) shall remain liable "for any charges or obligations which accrued" prior to the date of conveyance of rail properties to Conrail. The Reorganization Court held that the principal payments on the equipment obligations (railroad rolling stock obligations were not encompassed by the "exception" language of the statute because principal does not "accrue" and therefore, when EL conveyed its rail properties including its rolling stock to Conrail, the estate was relieved of making principal payments on this obligation.

Apparently the parties do not dispute that the interest payments on the equipment obligations which "accrued" prior to the date of conveyance are still owed by EL.

Conrail and USRA challenge the above ruling of the Reorganization Court on three grounds. First, Conrail and USRA argue that the record on this issue was not sufficiently developed for the Reorganization

Court to make an informed decision. Second, Conrail and USRA argue that the language of § 303(b)(3)(A)(i) does not differentiate between principal and interest accrued prior to conveyance, but rather the statute provides that when Conrail assumes the pre-conveyance obligations of EL under the equipment obligations, it "shall have a claim to direct reimbursement, as a current expense of administration, from such assignor [EL], together with interest on the amount so paid." Third, Conrail and USRA contend that the Special Court pursuant to § 209(e)(2) of the Rail Act as amended, 45 U.S.C. § 719(e)(2), has original and exclusive subject matter jurisdiction over the equipment obligations issue because this issue is encompassed within the Special Court's conveyance order which conveyed EL's rail properties to Conrail under § 303 of the Rail Act as amended.

The EL Trustees on the other hand, maintain that the Reorganization Court's interpretation of the word "accrue" under § 303(b)(3)(A)(i) was correct. The EL Trustees also assert that the Reorganization Court properly assumed jurisdiction over the subject matter of equipment obligations because EL never sought relief on this matter before the Special Court, and because neither the jurisdiction of the Special Court nor § 209 precludes the Reorganization Court from interpreting § 303(b)(3)(A)(i) in a proceeding initiated by the appellants.

■ We need not pass on the question of whether the issue of equipment obligations was sufficiently developed in the Reorganization Court nor on the meaning of the word "accrue" under § 303(b)(3)(A)(i) because we hold that the issue of liability for principal and interest payments on equipment obligations is within the original and exclusive jurisdiction of the Special Court.

The Railroad Revitalization and Regulatory Reform Act of 1976 added § 209(e) to the Rail Act. Senate Report No. 94–499, 94th Cong., 2d Sess. 84 (1976), (*Reprinted in* [1976] U.S.Code Cong. & Admin.News p. 99) states:

The amendment which adds subsection (e)(2) to Section 209 clarifies the post-con-veyance jurisdiction of the Special Court, and makes it clear that the Special Court would have exclusive jurisdiction to resolve disputes concerning the meaning and implementation of its transfer and conveyance orders under Section 303(b) of the Rail Act.

Section 209(e)(2) of the Rail Act as amended, states in part:

The original and exclusive jurisdiction of the special court shall include any action, whether filed by any interested person or initiated by the special court itself, to *interpret, alter, amend, modify,* or *implement* any of the orders entered by such court pursuant to section 743(b) [§ 303(b)] of this title in order to effect the purposes of this chapter or the goals of the final system plan. [emphasis added]

Section 743(b) [§ 303(b)] of the Rail Act as amended, generally provides for the conveyance of rail properties of the railroads in reorganization to Conrail "or any subsidiary thereof, the respective profitable railroads operating in the region, States, and responsible persons."

On March 25, 1976 the Special Court pursuant to § 209(e)(2) entered an order directing the EL Trustees to execute documents conveying EL's rail properties to Conrail. There is no dispute in this case that this conveyance order included EL's railroad rolling stock at issue herein.

On March 31, 1976, six days after the Special Court's conveyance order, the Reorganization Court in Paragraph 8 of Order No. 506 made its ruling on the railroad rolling stock at issue herein.

There can be little dispute that Order No. 506 of the Reorganization Court effectively "interpreted" the Special Court's conveyance order because the conveyance order expressly transferred EL's railroad rolling stock to Conrail, and Order No. 506 possibly "altered," "amended," or "modified" the conveyance order as well. Such action by the Reorganization Court is inconsistent with the Congressional mandate conferring original and exclusive jurisdiction on the Special Court to "interpret, alter, amend, or

modify" its own order. It opens the door to non-uniform conveyance orders which is precisely the opposite of the intent of Congress. *Cf. Consolidated Rail Corp. v. Illinois*, 423 F.Supp. 941, 945–47 (Sp.Ct. RRRA 1976), *cert. denied*, 429 U.S. 1095, 97 S.Ct. 1111, 51 L.Ed.2d 542 (1977). "Were we to view the Act differently, serious impediments would exist impairing the effective implementation of the Act." *Id.* at 949.

We therefore hold that the Reorganization Court lacked subject matter jurisdiction to pass upon the equipment obligation issue in this case.

■ Furthermore, our results are not changed by the facts that neither party sought "relief" on the equipment obligation issue before the Special Court and that USRA, one of the appellants, initiated these proceedings before the Reorganization Court, for the reason that it is well settled that parties cannot confer subject matter jurisdiction upon a court by their conduct or consent. *Mitchell v. Maurer*, 293 U.S. 237, 55 S.Ct. 162, 79 L.Ed. 338 (1934), and *Jackson v. Ashton*, 33 U.S. (8 Pet.) 148, 8 L.Ed. 898 (1834).

### IV

Pursuant to the § 211(h)(2) Agency Agreement incorporated into Order No. 506 of the Reorganization Court, procedures and policies were described which were "used to segregate the transactions related to operations between pre- and post-conveyance for processing under the agency agreement." These procedures were called "cut-off procedures." One such cut-off procedure concerned "inventory of material and supplies" which covered EL's physical inventory. The Reorganization Court held that the EL Trustees would "not be responsible for payment of amounts recorded as material not paid for." In other words, Conrail was made liable pursuant to the Agency Agreement to pay for EL's inventory received but not paid for prior to conveyance of EL's rail properties to Conrail.

Conrail and USRA contend, however, that Conrail has already paid for this inventory when it was conveyed to Conrail under the Special Court's conveyance order of March 25, 1976 "free and clear of all liens and encumbrances in exchange for securities of Conrail and certificates of value as required by the Rail Act." Conrail and USRA argue that the EL estate seeks "a result contrary to the Final System Plan [FSP], *i. e.*, to place inventories in a special category outside the conveyance process and to seek what amounts to payments from Conrail in cash," and thereby "retroactively alter the designation of the FSP and the resulting conveyance." Conrail and USRA state that the EL Trustees may appear before the Special Court at the valuation proceedings to prove the dollar value of the inventories conveyed. Conrail and USRA also maintain that any interpretation of the Special Court's conveyance order of March 25, 1976 is within the original and exclusive jurisdiction of the Special Court pursuant to § 209(e)(2), 45 U.S.C. § 719(e)(2), and to the extent that part of Order No. 506 of the Reorganization Court concerning EL's physical inventory intrudes upon the Special Court's conveyance order, the finding of the Reorganization Court was beyond its subject matter jurisdiction.

The EL Trustees on the other hand, assert that Order No. 506 merely provides that Conrail pay for the inventory obligations for which it is receiving the benefit. The EL Trustees argue that the inventory received prior to conveyance but for which the supplier has not been paid (the "cutoff" situation) is not covered by the Final System Plan. The EL Trustees also maintain that the Reorganization Court at the request of Conrail, properly passed upon this cut-off issue as part of the Agency Agreement.

The Final System Plan designated that much of EL's inventories were to be transferred to Conrail. *See* Vol. I FSP at 251–52. The Conference Report on the Railroad Revitalization and Regulatory Reform Act of 1976 amending the Rail Act, also spoke of transferring the inventory of the reorganization railroads under the Final System Plan and of the problem of computing inventory quantities more than six months

before transfer. Senate Conference Report No. 94–595, 94th Cong., 2d Sess. 206–07 (1976), (*Reprinted in* [1976] U.S.Code Cong. & Admin.News pp. 221–22), states:

> *It seems clear that current inventories of rail properties must be transferred in their entirety*, except as the Association may otherwise consent. Figures of quantity given in the final system plan for such inventories 6 to 8 months before anticipated transfer must of necessity be approximations only, particularly when the Association is not in a position to control either the rate of consumption or the rate of replacement. The dollar values given in the plan cannot be reasonably read to impose a limit on the amount of inventory of rail properties designated for transfer. [Emphasis added]

Therefore, the inventories involved herein clearly are encompassed within the Final System Plan.

▪ As already noted, on March 25, 1976 the Special Court pursuant to the Rail Act, entered a conveyance order effectuating the goals of the Final System Plan in which the EL Trustees executed documents conveying EL's rail properties to Conrail, including inventories of the EL estate, in exchange for "the stock and other securities of the Corporation and certificates of value issued by the Association," § 303(a)(1), 45 U.S.C. § 743(a)(1). As we held with respect to the equipment obligation issue, *supra*, so in like manner that part of Order No. 506 of the Reorganization Court concerning the physical inventories which EL received but did not pay for prior to conveyance of the rail properties to Conrail, interprets, alters, amends and/or modifies the conveyance order of the Special Court. Congress has reposed this judicial function to the exclusive jurisdiction of the Special Court. The reason for deference to the Special Court's jurisdiction is all the more compelling because the spectre of potential double liability against Conrail exists within the Reorganization Court's order, once by the "stock and other securities" payments, and again by the Reorganization Court's order itself. We hold therefore that the Reorganization Court lacked subject matter jurisdiction to pass upon the inventory obligation issue in this case.

We reserve for future consideration and determination the issue concerning liability for vacation pay which issue is currently the subject of settlement negotiations among the parties.

We affirm with respect to the escrow fund issue set forth herein in Part I. Furthermore, to the extent such determination has any effect after the enactment of the RTIA, we reverse with respect to the Reorganization Court's determination that "cash and other current assets" must be applied first to non-§ 211(h)(1) obligations, the discussion of which issue is set forth in Part II. We also reverse with respect to the railroad rolling stock and inventory issues for lack of subject matter jurisdiction, which issues are set forth in Parts III and IV.

Accordingly, this case is remanded for further proceedings not inconsistent with this opinion. Each party to pay own costs on appeal.